**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

        v.

DELRAY PRICE,
            *Defendant-Appellant.*

No. 05-30323

D.C. No.
CR-04-00364-MO

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

        v.

DELRAY PRICE,
            *Defendant-Appellant.*

No. 06-30157

D.C. No.
CR-04-00364-MO

OPINION

Appeal from the United States District Court
for the District of Oregon
Michael W. Mosman, District Judge, Presiding

Argued and Submitted
July 8, 2008—Portland, Oregon

Filed May 21, 2009

Before: Alfred T. Goodwin, Harry Pregerson and
Stephen Reinhardt, Circuit Judges.

Opinion by Judge Reinhardt

**COUNSEL**

Thomas H. Edmonds, Assistant United States Attorney, United States Attorney's Office for the District of Oregon, Portland, Oregon, for the plaintiff-appellee.

Frank Noonan, Assistant United States Attorney, United States Attorney's Office for the District of Oregon, Portland, Oregon, for the plaintiff-appellee.

Kelly A. Zusman, Assistant United States Attorney, United States Attorney's Office for the District of Oregon, Portland, Oregon, for the plaintiff-appellee (argued).

Michael R. Levine, Portland, Oregon, for the defendant-appellant (argued).

## OPINION

REINHARDT, Circuit Judge:

Delray Price was convicted of being a felon in possession of a firearm after Portland police officers found a gun hidden beneath the driver's seat of a car in which he was riding in the rear. Although the government presented circumstantial evidence that Price placed the firearm under the seat as the car was being pulled over, the evidence that sealed his fate at trial was testimony from a witness named Antoinette Phillips. Phillips testified that approximately fifteen minutes before Price was pulled over he was with her and some friends at her aunt's home when she saw a gun tucked into the waistband of his pants. Price's defense attorney vigorously attacked other aspects of the government's case at trial, but he could not overcome this direct evidence of Price's guilt. Price was convicted and sentenced to nearly eight years in prison.

What Price and his attorney did not know is that Antoinette Phillips has a lengthy history of run-ins with the Portland police that suggests that she has little regard for truth and honesty. In addition to being convicted of theft, she has been arrested multiple times for shoplifting and police records show at least one act of "theft by deception." She has also been convicted several times for fraudulently using false registration tags on her vehicle — a violation she continued to commit after each conviction, stopping only when a frustrated police officer finally scraped the false tags off of her license plates himself.

Price did not know about Phillips' multiple acts of fraud or dishonesty reflected in police reports, as well as in her police record — and therefore could not impeach her with that information — because the prosecutor never disclosed it to defense counsel. Price's counsel explicitly requested from the prosecutor "any evidence that any prospective Government witness has engaged in any criminal act, whether or not resulting in conviction," but all he received was evidence of Phillips' single conviction for second-degree theft. It is not clear whether the prosecutor himself ever possessed information that would have revealed Phillips' various acts of misconduct; at Price's new trial hearing, the prosecutor testified only that he did not "have [a] specific recollection" as to what information he personally possessed. However, what *is* clear is that, regardless of his own personal knowledge, the prosecutor utterly failed in his "*duty to learn* of any favorable evidence known to the *others* acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (emphases added). There is no doubt that the prosecutor instructed his lead investigative agent, a member of the Portland Police Department, "to run a criminal history check on Ms. Phillips." It is also beyond doubt that, in the prosecutor's own words, "the Portland Police Data System, generally will reflect *any police contacts* that [an] individual has had." However, as the prosecutor's testimony further reveals, he did not know or recall the results of the investigation that he directed his agent to undertake. Rather, when asked if the agent had in fact uncovered the details of Phillips' criminal history, the prosecutor could only respond, "He may have . . . . I can't say for sure."

Under longstanding principles of constitutional due process, information in the possession of the prosecutor *and* his investigating officers that is helpful to the defendant, including evidence that might tend to impeach a government witness, must be disclosed to the defense prior to trial. It is equally clear that a prosecutor cannot evade this duty simply by becoming or remaining ignorant of the fruits of his agents'

investigations. Because, here, the prosecutor failed to fulfill his duty to learn of and disclose favorable evidence that likely was in the possession of his lead investigating officer, and because the evidence of Phillips' criminal history is material, we hold that the prosecutor violated Price's rights under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. Accordingly, we reverse the denial of Price's motion for a new trial.[1]

## I.

On the evening of March 6, 2004, Portland police officers observed two young black men, whom they knew to be the subjects of outstanding parole-violation warrants, riding in the back seat of a two-door Plymouth Sundance that belonged to a young woman named Rosie Lewis. Lewis was driving the car, and one of her friends, Rebecca Jones, was sitting in the front-passenger seat. Two officers pulled behind the car to institute a stop while a third officer drove alongside it in a separate, unmarked civilian vehicle. All three officers testified that when the cruiser turned on its emergency lights, they observed one of the two young men, appellant Delray Price, who was seated behind the driver, bend over so that much of his upper body was out of sight. All of the officers stated that they believed Price was placing something underneath the seat in front of him.

---

[1]The appeal from the denial of Price's motion for a new trial was consolidated with Price's direct appeal in which he raises two trial-error challenges and also challenges the validity of his sentence. Because we grant Price a new trial in appeal No. 06-30157, we dismiss as moot appeal No. 05-30323. *See Felster Publ'g v. Burrell*, 415 F.3d 994, 998 (9th Cir. 2005) (" 'The test for mootness of an appeal is whether the appellate court can give the appellant any effective relief in the event that it decides the matter on the merits in his favor. . . .' In [this] case, no such relief could . . . be[ ] granted given that [the defendant] ha[s] already gotten the relief he sought . . . ." (internal citations omitted) (quoting *Garcia v. Lawn*, 805 F.2d 1400, 1402 (9th Cir. 1986)).

Once the car came to a stop and Price and the other back-seat passenger were placed under arrest pursuant to their warrants, Officer Joseph Santos searched the car, concentrating on the area beneath the driver's seat where he believed Price had hidden an object. According to his trial testimony, Officer Santos first looked under the seat from the rear, but was unable to see anything; however, when he reached under the seat from the front, he felt a gun on the floor. The gun, he later testified, was located behind a small lip that separated the area beneath the front of the seat, which was most easily accessible by the driver, from the area beneath the back of the seat, which was most easily accessible by a passenger in the rear. According to Officer Santos, he lifted the gun onto the top of the lip — to a position equally accessible by both the driver and the rear-seat passenger — so that it would be visible from his vantage point. He then took a picture of the gun in its new position. Contrary to police department protocol regarding the proper treatment of evidence, Officer Santos did not take a picture of the gun in the position in which he claims to have originally found it.

Six months later, Price was indicted on three federal felony charges: being a felon in possession of a firearm, possession with intent to distribute marijuana, and carrying a firearm in relation to drug trafficking.[2] We are here concerned only with the felon-in-possession charge. Much of the government's case relating to that charge consisted of circumstantial evidence, which Price's counsel vigorously attacked.[3] However, the government introduced one central piece of direct evidence to which Price's counsel had no effective response.

[2]When Price was arrested, the officers found multiple plastic bags on his person that, altogether, contained approximately seven grams of marijuana. Despite this exceedingly small amount of marijuana, Price was turned over to federal authorities who then decided to prosecute him for drug trafficking.

[3]We discuss this evidence and Price's response to it in detail during our discussion of prejudice. *See infra* Part II.B.

That evidence came from witness Antoinette Phillips who testified that she saw the gun that was ultimately retrieved from the car sticking out of Price's waistband minutes before he entered the vehicle and shortly before the police pulled him over. Phillips testified that she, her cousin, and the occupants of the car, including Price, had all met at her aunt's house earlier in the evening and had planned to go to a movie. According to Phillips, while at the house Price was sitting in her cousin's room and, when he stood up, she saw the handle of a gun in his waistband. When shown at trial the gun that was retrieved from the vehicle, Phillips testified that the handle looked the same as the handle of the gun she saw in Price's waistband.

Price's attorney sought to impeach Phillips by challenging her memory and her perception. He first asked her if she had smoked marijuana before Price came over to her aunt's house and later asked if she could have possibly confused a cell phone or pager for the handle of a gun. Although Phillips admitted to having smoked marijuana earlier in the evening, she responded to the latter line of questioning by simply reaffirming that what she saw in Price's waistband "looked like a gun to [her]." Price's attorney made no effort to impeach Phillips by challenging her honesty or truthfulness.

The prosecutor relied heavily on Phillips' testimony in his closing argument, stating to the jury, "[Y]ou have direct evidence of an eyewitness who saw this [gun] sticking out of the defendant's waistband, and she took the witness stand, Antoinette Phillips." He dismissed defense counsel's attempts to question Phillips' memory or perception by reminding the jury that Phillips unequivocally stated "No, it wasn't a pager." He then argued, "She knew what she saw . . . . [T]his item, ladies and gentleman, is something that people are going to remember seeing." The prosecutor further relied on Phillips' testimony to rehabilitate other aspects of his case-in-chief. Although he acknowledged that Officer Santos' method of handling the evidence was "perhaps not perfect," he told the

jury that Santos' account was "corroborate[d]" by the fact that "Antoinette Phillips s[aw the defendant] with the gun 15 minutes before" Santos pulled him over. He also stressed her veracity, telling the jurors "[Price] doesn't have a reason for why Antoinette Phillips would lie."

After hearing all of the evidence and arguments, the jury acquitted Price of the two charges related to drug trafficking, but convicted him of being a felon in possession of a firearm.[4] He was sentenced to ninety-two months in prison.

At no point prior to or during Price's trial did either he or his lawyer become aware of Phillips' extensive history with the Portland Police Department. These facts came to light only after Phillips became a witness in a second case that grew out of her testimony in Price's prosecution. Immediately after testifying against Price, Phillips claimed that she was threatened outside of the courthouse by Price's brother, Saleem Muhammad. On the basis of her accusation, Muhammad was prosecuted for witness intimidation by the same assistant United States Attorney who prosecuted Price. It was in the course of that second case, after a hotly contested fight over the need to reveal Phillips' record, that the evidence of her arrests for theft, the report of her theft by deception, and her convictions for false-tag violations were revealed. In Muhammad's case, in which Phillips was the government's only percipient witness, the presiding judge, Judge Garr M. King, allowed Muhammad to introduce portions of Phillips' record in order to impeach her. That impeachment was evidently successful: the jury failed to convict Muhammad.

---

[4]Price was also convicted of simple possession of marijuana, a lesser included offense of the indictment's second count, for which he received a concurrent sentence of three months in prison. The law permits the United States Attorney to prosecute someone federally for possessing small, personal-usage quantities of marijuana. Price does not raise any challenges on appeal in relation to his conviction for simple possession.

Upon learning of the impeachment evidence introduced in his brother's trial, Price moved for a new trial in his own case on the ground that the government violated the requirements of *Brady v. Maryland* by failing to turn over evidence of Phillips' prior arrests, conduct, and convictions. The district court held a hearing on Price's motion. At that hearing, Price's trial attorney testified that, had he been aware of Phillips' criminal history, he would have "used that evidence to argue in [his] closing argument that she cannot be believed because she's obviously got a problem with authority and . . . . that she [has] total disrespect for abiding by the law and being honest."[5] After Price's trial counsel concluded his testimony, the prosecutor presented his argument to the court. At the outset, he stated that the "matter [of Phillips' criminal history] was inquired into by [his investigative] agent," Detective Derek Anderson, who "determined that she had some arrests and some violation convictions." The prosecutor next argued to the court that he had in fact provided all of that information to Price's defense attorney prior to trial. Because Price's trial counsel had just testified under oath that he never received the material in question, his new counsel objected to the prosecutor's attempt to introduce contradictory evidence through oral argument. The district judge continued the hearing so as to allow a second prosecutor from the United States Attorney's office to examine under oath the prosecutor who tried the case.

When the trial prosecutor returned as a witness a few days later, his story was very different. Now under oath, he abandoned his initial position that he had provided Price's counsel with the material underlying the *Brady* claim, stating instead, "today I can't say with any precision what precisely I told Mr. Walker." As to the question of what information regarding Phillips' history was known to his investigative agent, the

---

[5]Price's counsel on appeal, who also represented him at the new-trial motion, is not the same attorney who represented him at trial and testified at the new trial hearing.

prosecutor also abandoned his prior statement that Detective Anderson had "determined that [Phillips] had some arrests and some violation convictions." Instead, the prosecutor now testified that he did not "have any recollection of the printout that Detective Anderson was examining on [his] behalf" or of what information the detective actually knew regarding Phillips' history with the Portland police. Further, the prosecutor testified, "I don't have [a] specific recollection . . . [as to] whether I actually saw any[ of the materials] myself or whether th[ey] w[ere] communicated to me in my conversations with my agent." When asked on cross examination if Detective Anderson's investigation could have produced evidence of Phillips' "violation convictions" and investigations for theft, the prosecutor conceded that it "might have." In response to further cross examination, the prosecutor testified that "the Portland Police Data System [(PPDS)], generally will reflect any police contacts that [an] individual has had" with the police, and that Detective Anderson, who was both a Portland Police Officer and a Special Agent with the Bureau of Alcohol, Tobacco, and Firearms, had complete access to the PPDS. Price's counsel then asked whether Detective Anderson had in fact accessed the PPDS while performing his investigation on the prosecutor's behalf. The prosecutor responded, "He may have in this case. . . . I can't say for sure whether he had PPDS [information] in this case with Ms. Phillips or not."

After hearing argument, the district court ruled on Price's new trial motion from the bench. It first stated that, had the evidence at issue been made available to Price at trial, it would have allowed his counsel to use portions of it for purposes of impeaching Phillips. Nonetheless, the court ruled that Price had not established a *Brady* claim because he had failed to demonstrate that the prosecutor personally had evidence in his possession that would have revealed Phillips' extensive history. As an alternative ground, the district court held that any failure to disclose the information was not prejudicial

under the standard laid out in *Brady* and its successor cases. Price appealed.

## II.

"A district court's denial of a new trial motion based on alleged *Brady* violations is reviewed de novo."[6] *United States v. Antonakeas*, 255 F.3d 714, 725 (9th Cir. 2001). There are three components of a *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). There is no dispute that the first component of a *Brady* violation exists in this case: *Brady* encompasses impeachment evidence, and evidence that would impeach a central prosecution witness is indisputably favorable to the accused. *See Giglio v. United States*, 405 U.S. 150, 154 (1972); *see also, e.g.*, *United States v. Blanco*, 392 F.3d 382, 387 (9th Cir. 2004) ("*Brady/Giglio* information includes 'material . . . that bears on the credibility of a significant witness in the case.' " (omission in original) (quoting *United States v. Brumel-Alvarez*, 991 F.2d 1452, 1461 (9th Cir. 1993)). Our decision therefore turns on the two remaining components of the *Brady* analysis.

---

[6]While it is clear that the legal questions at issue in a *Brady* claim are reviewed de novo, this circuit has not yet "had the opportunity to consider what, if any, deference should be afforded to a district court's factual findings . . . ." *United States v. Jernigan*, 492 F.3d 1050, 1062 (9th Cir. 2007) (en banc) (Bea, J. dissenting). Judge Bea provides a thoughtful analysis of the question and concludes, after reviewing the practices of other circuits, that an appellate court should accept a district court's purely factual findings — such as findings with respect to a witness's credibility or the existence of a particular historical fact — unless such findings are clearly erroneous; however, the question whether a defendant suffered prejudice, also known in the *Brady* context as the question of "materiality," is a legal matter that we review *de novo*. *Id.* In this case, because our analysis does not turn on the district court's resolution of any purely factual questions, we have no occasion to resolve the issue Judge Bea raises in *Jernigan*.

A.

**[1]** As stated above, in order for a *Brady* violation to have occurred, the evidence at issue "must have been suppressed by the State." *Strickler*, 527 U.S. at 281; *see also Edwards v. Ayers*, 542 F.3d 759, 768 (9th Cir. 2008) ("Suppression by the prosecution, whether willful or inadvertent, of evidence favorable to the accused and material to either guilt or punishment violates the Constitution."). The term "suppression" does not describe merely overt or purposeful acts on the part of the prosecutor; sins of omission are equally within *Brady*'s scope. *See Benn v. Lambert*, 283 F.3d 1040, 1053 (9th Cir. 2002) ("[T]he terms 'suppression,' 'withholding,' and 'failure to disclose' have the same meaning for *Brady* purposes."). We perform this step of the inquiry "irrespective of the good faith or bad faith of the prosecution" in failing to disclose favorable evidence. *Brady*, 373 U.S. at 87. There is no allegation that the trial prosecutor in this case acted willfully, maliciously, or in anything but good faith — but an "innocent" failure to disclose favorable evidence constitutes a *Brady* violation nonetheless.[7]

**[2]** At the outset, we note that the district court's ruling is predicated on a clear misconception of the governing law. In its ruling from the bench, the court held that no *Brady* violation occurred in this case because the prosecutor did not *personally* have in his possession the evidence of Phillips' prior arrests, conduct, and convictions. In ruling on Price's new trial motion, the district court stated that "the core of [a *Brady* violation[8]] is the Government has to either intentionally . . .

---

[7]"[T]he term '*Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence — that is, to any suppression of so-called '*Brady* material' — although, strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was [prejudicial]." *Strickler*, 527 U.S. at 281 (footnote omitted). We use the phrase in the former, less technical sense here. We consider the issue of prejudice in the next section of our analysis.

[8]The district court used the phrase "negligent nonprovision" to describe the alleged *Brady* violation, evoking our early *Brady* case law in which we

or through some kind of misunderstanding or negligence fail to disclose what it has. Here most, if not all of what is alleged to have not been disclosed wasn't known [to t]he Government — the prosecutor at least didn't have it. So we don't have [a *Brady* violation]."[9] The district court misunderstood the law. The Supreme Court has clearly held that "*Brady* suppression occurs when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecutor.' " *Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006) (per curiam) (quoting *Kyles*, 514 U.S. at 438). Accordingly, the district court's reliance on the prosecutor's lack of personal knowledge of the *Brady* material demonstrated a clearly erroneous understanding of the law as it has existed at least since *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). *See also Giglio*, 405 U.S. at 154; *Jackson v. Brown*, 513 F.3d 1057, 1073 (9th Cir. 2008).

[3] As the prevailing Supreme Court precedents make clear, the district court should have considered whether the government failed to disclose the relevant information in the possession of *any* of its agents involved in Price's prosecution, not just what the prosecutor himself personally knew. The prosecutor's initial statements at the new trial hearing suggested that his agents were aware of the exculpatory infor-

---

used the phrase "negligent nondisclosure." *See United States v. Butler*, 567 F.2d 885 (9th Cir. 1978). The negligent nondisclosure doctrine, however, was altered significantly when the Supreme Court held that the *Brady* analysis is the same "regardless of [a] request" or lack thereof by the defendant for favorable material. *See Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (discussing *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Accordingly, we have substituted the more current terminology when quoting the district court so as to avoid confusion.

[9]After making this statement, the district court promised to "take . . . up in a moment" the question of Detective Anderson's knowledge or possession of the relevant material. However, it never did so. It appears that, in the course of issuing its oral ruling, the district court simply overlooked the import of Detective Anderson's role in the analysis.

mation, as he stated that Phillips' criminal history "was inquired into by" Detective Anderson and that Anderson "determined that she had some arrests and some violation convictions." If this statement is true, then our inquiry with regard to the second *Brady* component is complete: "[E]xculpatory evidence cannot be kept out of the hands of the defense just because the prosecutor does not have it, where an investigating agency does. That would undermine *Brady* by allowing the investigating agency to prevent production by keeping a report out of the prosecutor's hands until the agency decided the prosecutor ought to have it . . . ." *Blanco*, 392 F.3d at 388 (quoting *United States v. Zuno-Arce*, 44 F.3d 1420, 1427 (9th Cir. 1995)). Moreover, as we have previously held:

> actual awareness (or lack thereof) of exculpatory evidence in the government's hands, . . . is not determinative of the prosecution's disclosure obligations. Rather, the prosecution has a *duty to learn* of any exculpatory evidence known to others acting on the government's behalf. Because the prosecution is in a unique position to obtain information known to other agents of the government, *it may not be excused from disclosing what it does not know but could have learned.*

*Carriger v. Stewart*, 132 F.3d 463, 479-80 (9th Cir. 1997) (en banc) (citations omitted) (emphases added). Our holding in *Carriger* drew directly from holdings of the Supreme Court, which state that "[i]n order to comply with *Brady*, . . . 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in th[e] case, including the police.' " *Strickler*, 527 U.S. at 281 (quoting *Kyles*, 514 U.S. at 437). Just as it "would undermine *Brady* [to] . . . allow[ ] the prosecutor to tell the investigators not to give him certain materials unless he asked for them," *Blanco*, 392 F.3d at 388 (quoting *Zuno-Arce*, 44 F.3d at 1427), it would equally undermine *Brady* for a prosecutor to direct his investigator to perform an investigation and then

fail to discover the investigation's full results. Accordingly, if Detective Anderson did in fact know of Phillips' "arrests" and "violation convictions" as the trial prosecutor initially stated, and if the prosecutor either failed to disclose the information *or* failed to discover that his agent knew of or possessed it, a *Brady* violation occurred.

The issue here is complicated, however, by the fact that the record is not conclusive with respect to what information was known to Detective Anderson or conveyed to the prosecutor. The prosecutor's initial statement to the court, in which he stated that Detective Anderson actually "determined that [Phillips] had some arrests and some violation convictions," is inconsistent with statements he gave under oath six days later. When the prosecutor returned as a witness after the district court continued the hearing on the new-trial motion, he no longer stated that Detective Anderson had known of the information underlying Price's *Brady* claim. Instead, at the second hearing, the prosecutor stated that he "d[id]n't have any recollection" of the information that Anderson possessed or conveyed to him. In response to this change in position by the prosecutor, Price's attorney told the court that he "would like to continue th[e] hearing [a second time in order to] subpoena and bring in Detective Anderson." Unfortunately, no such continuance occurred because the district court stated, erroneously, that Anderson's testimony was irrelevant to its decision.[10] Thus, while the prosecutor testified that Detective

---

[10]By contrast, when the court believed that the record would be insufficient to support the denial of the new-trial motion without the prosecutor's testimony, the court insisted on a continuance and granted one *sua sponte*. Although we need not pass upon the propriety of insisting on the first continuance while rejecting the second, we note that "[a] district court's . . . denial of a continuance is reviewed for abuse of discretion even where . . . no motion for continuance [i]s made," *United States v. Orlando*, 553 F.3d 1235, 1237 (9th Cir. 2009), and that "[a] trial court clearly abuses its discretion . . . if denial of [a] continuance was arbitrary or unreasonable," *United States v. Torres-Rodriguez*, 930 F.2d 1375, 1383 (9th Cir. 1991), or predicated on a misunderstanding of the law. The latter is clearly the case here.

Anderson very well "may have" had all of the information regarding Phillips' history in his possession prior to trial, there is no conclusive resolution of this factual question in the record.

The suppression prong of *Brady* may be met, however, even though a "record is not conclusive as to whether the individual prosecutor[ or investigator] . . . ever actually possessed" the *Brady* material. *Carriger*, 132 F.3d 463 at 479. The proponent of a *Brady* claim — i.e., the defendant — bears the initial burden of producing some evidence to support an inference that the government possessed or knew about material favorable to the defense and failed to disclose it.[11] *Cf. United States v. Lopez*, 534 F.3d 1027, 1034 (9th Cir. 2008); *United States v. Brunshtein*, 344 F.3d 91, 101 (2d Cir. 2003). Once the defendant produces such evidence, the burden shifts to the government to demonstrate that the prosecutor satisfied his duty to disclose all favorable evidence known to him or that he could have learned from "others acting on the government's behalf." *Kyles*, 514 U.S. at 437.

**[4]** In this case, Price has met his initial burden of producing some evidence supporting the inference that the government failed to disclose favorable material. The record contains sworn testimony from the prosecutor himself that Detective Anderson "may have" had in his possession all of the *Brady* material underlying Price's claim, as well as that Anderson was asked to investigate Phillips' criminal history

---

[11]If the record is conclusive that all relevant agents of the government did *not* know about the *Brady* material, then, of course, no *Brady* violation has occurred as the "government has no obligation to produce information which it does not possess or of which it is unaware." *Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir. 1995). This is not the case if the prosecutor suspects that a witness has committed perjury. "When a prosecutor suspects perjury, the prosecutor must at least investigate" further, consistent with his "duty to correct what he knows [or suspects] to be false and elicit the truth." *Morris v. Ylst*, 447 F.3d 735, 744 (9th Cir. 2006) (citing *Napue v. Illinois*, 360 U.S. 264, 270 (1959)).

and had access to a police database that contained that information. In addition, the prosecutor at another point in the hearing represented to the court that Anderson had in fact investigated Phillips' criminal history and had determined that she had "arrests" and "convictions," which were not disclosed to the defense. The prosecutor's performance in this regard is troubling, and may, upon remand, warrant further inquiry by the district judge. It is clear, however, that, whatever the truth, the government has failed to demonstrate that the prosecutor satisfied his constitutional duty to learn the results of Anderson's investigation. Certainly, where the prosecutor states either that he cannot remember or does not know what information his agents relayed to him, the government's burden is not met. Allowing such convenient and conclusory testimony to defeat a *Brady* claim would render a defendant's right to obtain *Brady* material meaningless.

**[5]** In this case, despite the fact that the prosecutor instructed Detective Anderson "to run a criminal history check on Ms. Phillips to" find information "that could be used for impeachment," and despite the fact that "the Portland Police Data System generally will reflect *any* police contacts that [an] individual has had" and was "available to Detective Anderson," the prosecutor stated under oath, "*I can't say for sure* whether [Anderson] had PPDS in this case with Ms. Phillips or not," "[h]e may have." This testimony demonstrates that, at the least, the prosecutor failed in his "duty to learn" the results of the investigation he directed his lead investigative agent to perform. *Kyles*, 514 U.S. at 437. Because a prosecutor must fulfill this duty "[i]n order to comply with *Brady*," *Strickler*, 527 U.S. at 281, the prosecutor in this case "may not be excused from disclosing what [he] d[id] not know but could have learned," *Carriger*, 132 F.3d at 480. Accordingly, Price has satisfied the second component of the *Brady* analysis.

## B.

**[6]** Having concluded that the first two components of Price's *Brady* claim have been met, we turn now to the final issue: whether the failure to disclose the *Brady* material was prejudicial.[12] "The touchstone of [the prejudice analysis] is whether admission of the suppressed evidence would have created a 'reasonable probability of a different result.' " *United States v. Jernigan*, 492 F.3d 1050, 1053 (9th Cir. 2007) (en banc) (quoting *Kyles*, 514 U.S. at 434). As the Supreme Court has stressed, it has "rejected a standard that would require the defendant to demonstrate that the evidence if disclosed probably would have resulted in acquittal." *United States v. Bagley*, 473 U.S. 667, 680 (1985) (citing *United States v. Agurs*, 427 U.S. 97, 111 (1976)). Rather, the Court has "defined a 'reasonable probability' as 'a probability sufficient to undermine confidence in the outcome' " of the trial. *Id.* at 682 (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

The government argues that only information that would have been admissible at trial may be considered in our prejudice analysis. This issue was discussed in the Supreme Court's decision in *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995) (per curiam), in which the Court held that the failure to disclose the results of a polygraph test was not prejudicial

---

[12]The prejudice analysis is often phrased in terms of "materiality." *See, e.g.*, *United States v. Jernigan*, 492 F.3d 1050, 1053-54 (9th Cir. 2007) (en banc). However, "[t]he terms 'material' and 'prejudicial' are used interchangeably in *Brady* cases. Evidence is not 'material' unless it is 'prejudicial,' and not 'prejudicial' unless it is 'material.' Thus, for *Brady* purposes, the two terms have come to have the same meaning." *Benn v. Lambert*, 283 F.3d 1040, 1053 n.9 (9th Cir. 2002). Somewhat confusingly, the suppressed evidence underlying a *Brady* claim is itself often referred to as "so-called '*Brady* material.' " *Strickler*, 527 U.S. at 281. We therefore use the term "prejudice" here so as to avoid the linguistic awkwardness that inheres in determining whether "*Brady* material" is or is not "material."

because the results were not admissible in evidence. As we have previously stated in *Paradis v. Arave*, however, "[i]n *Bartholomew*, the Court did not categorically reject the suggestion that inadmissible evidence can be material under *Brady*, if it could have led to the discovery of admissible evidence." 240 F.3d 1169, 1178 (9th Cir. 2001). While there appears to be some disagreement as to *Bartholomew*'s scope, *see id*. at 1178-79 (citing cases), this case, like *Paradis*, "does not require resolution of that possible conflict." *Id.* at 1179. Regardless of whether inadmissible evidence is material under *Brady* if its disclosure could have led the defendant to discover favorable admissible evidence, "under Ninth Circuit law 'evidence is material if it might have been used to impeach a government witness.' " *Id.* (quoting *Carriger*, 132 F.3d at 481).

Here, contrary to the government's assertion, the nondisclosed evidence of Phillips' criminal history was admissible for purposes of impeaching her testimony. The record demonstrates that the following portions of Phillips' criminal history were not disclosed to Price: (1) three arrests for theft; (2) a report of "theft by deception," Or. Rev. Stat. § 164.085 (2007); and (3) three convictions for false-tag violations, also known as "[i]llegal alteration or display of plates," Or. Rev. Stat. § 803.550 (2007). The government does not challenge the conclusion reached by the district courts in this case and in the related prosecution of Price's brother, Saleem Muhammad, that Phillips' false-tag convictions were admissible for purposes of impeachment. *Cf.* Fed. R. Evid. 609(a)(2). As for theft and theft by deception, the government argues that because *convictions* for these acts would have been inadmissible under Rule 609 such acts therefore cannot be considered in our analysis. Phillips, however, was not convicted of these offenses, and our inquiry is therefore governed by Rule 608(b), not Rule 609. *See United States v. Osazuwa*, ___ F.3d ___, ___ No. 08-50244, slip op. at 5377 (9th Cir. 2009) ("Rule 608(b) permits impeachment . . . by specific acts that have not resulted in a criminal conviction. Evidence relating

to impeachment by way of criminal conviction is treated exclusively under Rule 609."). Under Rule 608(b), "specific instances" of a witness's prior conduct *may* be admissible "in the discretion of the court" for purposes of impeachment in order to show a witness's "character for truthfulness or untruthfulness."[13] Where the prosecution possesses or knows of material favorable to the defendant that would be admissible subject to the court's discretion *Brady* requires that such material be turned over to the defense. *See United States v. Van Brandy*, 726 F.2d 548, 552 (9th Cir. 1984) ("[W]here doubt exists as to the usefulness of evidence, [the prosecutor] should resolve such doubts in favor of full disclosure . . . "). Here, the district court stated that it would have allowed Price's counsel to use at least some of the nondisclosed material to impeach Phillips. Because all of the nondisclosed material underlying Price's *Brady* claim was potentially admissible for purposes of impeachment, we consider all of that material in determining whether the failure to disclose Phillips' criminal conduct was prejudicial.[14]

---

[13]We do not suggest that evidence of a *witness's* prior thefts or other dishonest conduct will always be admissible under Rule 608(b) or even that it should ordinarily be admissible against a *defendant* in a criminal trial. Moreover, the district court's decision to admit such evidence must not constitute an abuse of discretion. *E.g.*, *United States v. Scott*, 74 F.3d 175, 177 (9th Cir. 1996). Specifically, where a defendant takes the stand in his own defense, courts must be especially careful to weigh the value of any evidence the prosecutor might adduce under Rule 608(b) against the strong possibility that evidence of prior crimes will improperly prejudice the jury by causing it to believe that, if the defendant committed other crimes, he is therefore more likely to be guilty of the crime for which he is on trial. *See* Fed. R. Evid. 403, 404(b). In such instances, courts must bear in mind that "Fed. R. Evid. 403 modifies . . . rule [608(b)] by providing that otherwise admissible and relevant evidence may be excluded if the court determines that its probative value is substantially outweighed by the danger of unfair prejudice." *United States v. Geston*, 299 F.3d 1130, 1137 n.2 (9th Cir. 2002).

[14]The prosecutor apparently also believed that he was only required to turn over evidence of criminal *convictions* that he or his agent uncovered in Phillips' record. This is not so. "[I]t is the state's obligation to turn over

**[7]** In determining whether the failure to disclose *Brady* material undermines our confidence in the outcome of the trial, we must weigh the withheld evidence "in the context of the entire record." *Jernigan*, 492 F.3d at 1053 (quoting *Benn*, 283 F.3d at 1054). Here the prosecution presented only three items of evidence in support of the felon-in-possession charge: testimony by the arresting officers that Price bent over as the car came to a stop, testimony regarding the location of the gun recovered from the vehicle, and Phillips' testimony that she saw the gun in Price's waistband approximately fifteen minutes before his arrest. Price's counsel's questioning significantly undermined the first two aspects of the govern-

---

*all* information bearing on [a government] witness's credibility. This must include the witness's criminal *record*, including prison records, and *any* information therein which bears on credibility." *Carriger*, 132 F.3d at 480 (emphases added) (citation omitted).

For the benefit of trial prosecutors who must regularly decide what material to turn over, we note favorably the thoughtful analysis set forth by two district courts in this circuit:

> [T]he 'materiality' standard usually associated with *Brady* . . . should not be applied to pretrial discovery of exculpatory materials. . . . [J]ust because a prosecutor's failure to disclose evidence does not violate a defendant's due process rights does not mean that the failure to disclose is proper. . . . [T]he absence of prejudice to the defendant does not *condone* the prosecutor's suppression of exculpatory evidence [*ex ante*]. . . . [Rather,] the proper test for pretrial disclosure of exculpatory evidence should be an evaluation of whether the evidence is favorable to the defense, i.e., whether it is evidence that helps bolster the defense case or impeach the prosecutor's witnesses. . . . [I]f doubt exists, it should be resolved in favor of the defendant and full disclosure made. . . . [T]he government [should therefore] disclose all evidence relating to guilt or punishment which might reasonably be considered favorable to the defendant's case, even if the evidence is not admissible so long as it is reasonably likely to lead to admissible evidence.

*United States v. Acosta*, 357 F. Supp. 2d 1228, 1239-40 (D. Nev. 2004) (emphasis added) (citing *United States v. Sudikoff*, 36 F. Supp. 2d 1196 (C.D. Cal. 1999)).

ment's case. On cross examination, counsel established conflicts in the arresting officers' testimony: two officers said that the defendant bent over only once, one officer testified that he bent over twice, and a fourth government witness — Rebecca Jones, who was in the car with Price — testified that he did not bend over at all. Given these inconsistencies, Price argued to the jury that the "bending over" story was a *post hoc* fabrication that the officers invented after they found the gun. As to the gun's location in the car, Price's attorney succeeded in raising serious questions regarding the probative value of the testimony of Officer Santos as well as of the photograph taken by him. Santos admitted that he moved the gun before photographing it and that doing so constituted a violation of police protocol. Another government witness agreed, testifying that Santos' admissions established that he handled the evidence improperly. Moreover, Santos acknowledged on cross examination that he did not mention to *anyone* that he had moved the gun until two weeks before trial, during a meeting with the prosecuting attorney.

**[8]** In contrast to the circumstantial evidence offered by the arresting officers, including Officer Santos, as to which substantial doubt was raised as a result of defense counsel's questioning, Phillips' testimony provided direct evidence of Price's guilt and defense counsel was unable to seriously challenge it on cross examination. Phillips was indisputably "the prosecution's star witness." *Carriger*, 132 F.3d at 480. As we have previously held, "[i]mpeachment evidence is especially likely to be material when it impugns the testimony of a witness who is critical to the prosecution's case." *Silva v. Brown*, 416 F.3d 980, 987 (9th Cir. 2005). Moreover, while Price's counsel thoroughly challenged other aspects of the government's case, he was in no position to attack Phillips' credibility. Instead, he simply offered a brief argument that her memory was faulty and that she mistook a cell phone or a pager for a gun handle.

**[9]** The jury had little reason to doubt Phillips' memory and absolutely no reason to question her truthfulness. The prose-

cutor exploited this in his closing argument, arguing that even though Officer Santos' method of handling the evidence was "perhaps not perfect," the jury could disregard infirmities in his account because his testimony was "corroborate[d]" by the fact that "Antoinette Phillips s[aw the defendant] with the gun 15 minutes before" Santos pulled Price over. The prosecutor then further emphasized Phillips' testimony by arguing to the jury that a central weakness in Price's defense was that he "doesn't have a reason for why Antoinette Phillips would lie." Of course, Price could not give the jury a reason to doubt Phillips' truthfulness because the government failed to give *him* the evidence detailing her history of dishonest and fraudulent conduct. *Cf. Benn*, 283 F.3d at 1056 (holding that *Brady* material is especially likely to be prejudicial if it "would have provided the defense with a new and different ground of impeachment"); *Silva*, 416 F.3d at 989 (same).

[10] Had Price been able to discredit Phillips' testimony, there is a reasonable probability that he could have persuaded the jury that there was a reasonable doubt as to whether the gun found under the driver's seat belonged to him. Indeed, this was his defense at trial.[15] Phillips' testimony, however, firmly established Price's guilt and rendered his ability to undermine other aspects of the government's case of little consequence. Had the evidence of Phillips' past conduct been disclosed, "there is a reasonable probability that the withheld evidence would have altered at least one juror's assessment" regarding Price's possession of the gun. *Cone v. Bell*, ___ S. Ct. ___, ___ (slip. op. at 2) (2009); *see also Duncan v. Ornoski*, 528 F.3d 1222, 1245 (9th Cir. 2008). Accordingly, because the evidence in question "would have affected the trial in such a way as to undermine our confidence in the jury's verdict, we conclude that a *Brady* violation occurred." *Bailey v. Rae*, 339 F.3d 1107, 1109 (9th Cir. 2003).

---

[15]Lewis, the driver of the car, planned to testify in Price's defense that the gun was hers, but moments before taking the stand she decided instead, on advice of counsel, that she would exercise her Fifth Amendment right against self-incrimination.

### III.

For the reasons stated above, we hold that Price's due process rights were violated when the government failed to disclose favorable evidence in a manner that was prejudicial to the outcome of the case. Accordingly, the denial of Price's motion for a new trial is **REVERSED** and the case is **REMANDED** for further proceedings consistent with this opinion.