
# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 75474-2-I (consolidated |
| Respondent, | ) | with No. 76072-6-I) |
| | ) | |
| v. | ) | DIVISION ONE |
| | ) | |
| KAMRAN MONGHATE, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: September 10, 2018 |

TRICKEY, J. — A jury convicted Kamran Monghate of two counts of first degree arson and one aggravating factor. On appeal, he argues that the State withheld evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and that the prosecutor committed various forms of misconduct. Monghate also contends that the trial court erred when it failed to make sufficient inquiry into his competency to stand trial, denied his motion to discharge his court appointed counsel, and did not consider his mental illness in determining his ability to pay any legal financial obligations. Finally, Monghate maintains that the trial court erred by imposing an exceptional sentence disproportionate to similar cases. Finding no error, we affirm.

## FACTS

Monghate was born in Iran, and left following the 1979 revolution. In 1987, while on refugee status in England, Monghate came to the United States to visit

his sister, Mitra Mohandessi.[1] Monghate remained in the United States after his tourist visa expired, and his refugee passport to England lapsed.

Monghate applied for permanent residency in the United States, but the process took many years. Monghate could not work without a valid passport or documentation. Monghate finally obtained a work permit in 1998.

Monghate lived with Mitra and her husband, Sahba Mohandessi, for about a year. He moved into his own apartment in Bellevue in August 1988. He helped build two homes in Issaquah that were finished in 1992 and 1993. Mitra and Sahba's family occupied one of the houses. Sahba's sister, Taraneh Mohandessi, and their elderly mother lived in the other house.

Around 2005, Monghate began to visit his relatives less frequently. Monghate also began to resent Sahba, and came to believe that Sahba was manipulating others to undermine him.

In 2009, Monghate stopped working. He subsequently had difficulty supporting himself financially. Monghate stopped paying rent in January or February 2010, and both Monghate and Monghate's landlord contacted Mitra about his rent. Mitra paid Monghate's outstanding rental payments, and continued to pay his rent each month.

In the fall of 2011 or 2012, after a period of very limited contact between Monghate and his family members, Mitra and Monghate's mother went to Monghate's apartment. Monghate became very angry, slapped Mitra, and told her to leave him alone. Afterward, Mitra told Monghate that he needed to be evaluated

---

[1] For clarity, members of the Mohandessi family will be referred to by their first names. No disrespect is intended.

2

and to get help.

In December 2012, Monghate's landlord told Mitra that Monghate had not been seen leaving his apartment for some time. Mitra and Sahba went to Monghate's place with the police to conduct a welfare check. When Monghate opened the door, he handed a handwritten letter to a police officer, who in turn gave it to Sahba.

The letter was addressed to Sahba, and contained many profanities and insults directed toward him and his family. Monghate accused Sahba of ruining his life and improperly using his position as a government employee to manipulate Mitra. Monghate was also convinced that Sahba owed him $200,000 from the time that Monghate had been unable to obtain permanent residency in the United States.

On March 18, 2013, at approximately 5:00 a.m., Taraneh called Mitra and Sahba because her home was on fire. Taraneh and her mother had been asleep upstairs when the fire started. Mitra and Sahba ran outside of their home and saw fire and smoke coming from the garage of Taraneh's home.

Mitra and Sahba learned that another fire, which had not caught on, had been started on the side of Taraneh's home. A fire in that location would have blocked the only stairway down from the upper floor of the home, where the bedrooms were located. After the fire was extinguished, Taraneh and her mother went to live in Mitra and Sahba's home.

Fire Investigator Thomas Devine of the King County Sheriff's Office was dispatched to Taraneh's home. Devine observed two areas of damage on the

outside of the home. He smelled a pungent odor similar to kerosene. Near one of the origin points of the fires, Devine found melted remains of a black plastic garbage bag containing combustible materials. The combustible materials were mostly mailers, flyers, and United States Postal cardboard envelopes addressed to Kamran Monghate at his Bellevue address.

Following his investigation, Devine concluded that the fire had been set intentionally. Devine conducted additional investigations from March 29 to April 3, 2013, including an interview about Monghate with Taraneh, Mitra, Sahba, and Mitra and Sahba's children.

On April 8, 2013, there was another fire at Taraneh's home. Fire Investigator Charles Andrews of the King County Sheriff's Office investigated the fire. The home had been unoccupied when the second fire occurred.

Andrews concluded that the fire had been intentionally set because the fire started outside of an unoccupied home and originated in an area without a source of ignition. He also detected the odor of ignitable liquid at the fire's origin point. He recovered a melted black plastic bag and a water bottle that smelled of the ignitable liquid. Later testing concluded that the liquid in the water bottle contained partly evaporated gasoline and a heavy range petroleum distillate.

Andrews sent the plastic bottle to the Washington State Patrol Crime Laboratory. The crime laboratory was able to obtain DNA (deoxyribonucleic acid) from the bottle. The sample was slightly degraded and was a mixture of DNA profiles, but included Monghate's DNA profile. According to the crime laboratory's report, the likelihood of a random person being a potential contributor to the DNA

mixture was one in one million.

After the second fire, Devine met with Mitra and obtained the letter that Monghate had written to Sahba. On May 2, 2013, Devine, Andrews, and other law enforcement officers executed a search warrant on Monghate's apartment. Devine located Monghate in the apartment, and took him into custody. The apartment contained a large amount of paperwork similar to that which had been found at the ignition source of the March 18 fire.

While Devine was escorting Monghate out of the apartment, Monghate directed the police to an envelope marked "Police."[2] The envelope included a letter written by Monghate dated September 19, 2011. The letter detailed Monghate's anger at perceived wrongs done by Mitra and Sahba, and contained a great deal of profanity that was primarily directed toward Sahba. The letter mentioned that Monghate "should have killed" Sahba years before, and directed Sahba and his family to "die."[3]

Later, Andrews and others seized several containers that contained liquid or may have contained ignitable liquids from a truck owned by Monghate. Analysis of the containers' contents indicated petroleum products, including partly evaporated gasoline and heavy range petroleum distillate.[4] A search of a car that Monghate owned revealed two lighters and crumpled paper.

The State charged Monghate with two counts of first degree arson: count I for the fire on March 18, 2013, and count II for the fire on April 8, 2013. The March

---

[2] 31 Report of Proceedings (RP) (Apr. 27, 2016) at 2122.
[3] 34 RP (May 3, 2016) at 2654, 2657.
[4] Monghate disputed whether the containers' contents included ignitable liquids at trial.

18 count also alleged the aggravating factor that Monghate knew or should have known that the "victim(s)" were particularly vulnerable and incapable of resistance, and that his knowledge was a substantial factor in his commission of the offense.[5]

In January 2014, the trial court found Monghate incompetent to stand trial and committed him for a restoration period. Monghate's diagnoses were psychosis, auditory hallucinations, schizophrenia, and major depressive disorder that was in partial remission. In June 2014, the trial court ruled that the State had failed to prove that Monghate's competency had been restored. In October 2014, Monghate demanded a jury trial on the issue of his competency. In December 2014, a jury found that Monghate was competent to stand trial.

On September 30, 2015, midway through his first trial on the arson charges, Monghate's counsel raised the issue of his competency again. Monghate had chosen to testify. His counsel argued that it was still her position that Monghate was not competent and was unable to assist counsel and take advantage of the advice of counsel. Monghate's counsel did not request a new competency evaluation.

The trial court noted Monghate's counsel's continuing concerns, but stood by the prior jury finding of competency. The trial court made an oral finding that Monghate appeared to be aware of the court proceedings and the roles of the people involved, and that he was assisting counsel adequately.

In October 2015, the trial court declared a mistrial in Monghate's first trial because the jury was unable to reach a unanimous verdict.

---

[5] Clerk's Papers (CP) at 133.

On March 31, 2016, Monghate moved to discharge his court-appointed counsel, arguing that his attorney had not kept him informed of proceedings, was disrespectful towards him, and was unreliable. The trial court noted that Monghate's counsel had obtained a mistrial in the prior proceedings, and that she was a very experienced and well-respected lawyer. The trial court denied Monghate's motion without prejudice.

The next day, Monghate again moved to discharge counsel. Monghate argued that his counsel had not provided him with a full transcript of his previous trial despite his request, had not fully investigated several issues, and argued with him. Monghate's counsel stated that she had ordered relevant parts of the transcript, and had answered Monghate's questions about her investigation into his immigration status as he had requested. The trial court found that appointing new counsel would not address Monghate's concerns, and denied Monghate's motion.

In April 2016, the trial court declared a mistrial early in Monghate's second trial when Devine testified about evidence the trial court had suppressed.

On May 6, 2016, after a third trial, the jury found Monghate guilty of both counts of arson in the first degree. Monghate was one of the witnesses who testified. The jury further found the aggravating factor that Monghate knew or should have known that the victim was particularly vulnerable.

After the jury returned its verdicts, Monghate moved for dismissal or a new trial, arguing that the State had violated Brady, 373 U.S. 83, by failing to disclose impeachment evidence about Devine's background. The evidence concerned an

7

allegation of cheating against Devine when he attended the Washington State Patrol Academy in 1996, his dismissal for cause from the academy, and his later failure to disclose his termination when he reapplied in 2004. Devine submitted a declaration that he had been exonerated of the accusation, as well as documentary evidence showing that he had disclosed the incident to the King County Sheriff's Office when he applied to work as an arson investigator.

The trial court denied Monghate's Brady motion, finding in part that the allegation of cheating was unsubstantiated and that Devine's declaration established that he had been exonerated. The trial court also denied Monghate's motion to vacate the jury's finding of the vulnerable victim aggravating circumstance and his motion for a new trial based on prosecutorial misconduct during closing argument.

The trial court imposed an exceptional sentence of 120 months. The trial court also imposed mandatory legal financial obligations (LFOs) but waived interest, trust fees, and non-mandatory costs.

Monghate appeals.

ANALYSIS

Motion to Discharge Counsel

Monghate argues that the trial court erred when it denied his motion to discharge court appointed counsel without sufficient inquiry into the alleged dispute. Because the trial court received adequate clarification about Monghate's complaints, we disagree.

When the "relationship between lawyer and client completely collapses, the refusal to substitute new counsel violates the defendant's Sixth Amendment right to effective assistance of counsel." In re Pers. Restraint of Stenson, 142 Wn.2d 710, 722, 16 P.3d 1 (2001).

When reviewing a trial court's refusal to appoint new counsel, the appellate court considers "(1) the extent of the conflict, (2) the adequacy of the [trial court's] inquiry, and (3) the timeliness of the motion." Restraint of Stenson, 142 Wn.2d at 724 (citing United States v. Moore, 159 F.3d 1154, 1158-59 (9th Cir. 1998)).

When analyzing the extent of the conflict, the trial court examines the extent and nature of the breakdown in communication and its effect on the representation of the defendant. Restraint of Stenson, 142 Wn.2d at 724. Conflicts sufficient to merit a discharge of counsel include "a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant." State v. Stenson, 132 Wn.2d 668, 734, 940 P.2d 1239 (1997). A lack of accord, general loss of trust, or disagreement over trial tactics are insufficient to warrant a substitution of counsel. See State v. Cross, 156 Wn.2d 580, 606-07, 132 P.3d 80 (2006); Restraint of Stenson, 142 Wn.2d at 724; Stenson, 132 Wn.2d at 734.

"An adequate inquiry must include a full airing of the concerns . . . and a meaningful inquiry by the trial court." Cross, 156 Wn.2d at 610.

The appellate court reviews "trial court decisions relating to attorney/client differences for abuse of discretion." Cross, 156 Wn.2d at 607.

Here, the trial court held two hearings on Monghate's motions to discharge counsel. Monghate was given an opportunity to describe his dissatisfaction with his counsel at length. After hearing Monghate's complaints, the trial court asked Monghate's counsel to clarify the alleged disputes and inquired into what steps were being taken to address Monghate's concerns. Following its inquiries, the trial court concluded that Monghate had not provided a factual basis for his complaints, that his trial counsel was taking steps to address his concerns where possible, and that Monghate would not be benefitted by dismissing his counsel.

Thus, the trial court provided Monghate with an opportunity to voice his concerns, inquired into the steps his counsel had taken to address any issues, and concluded that the conflict did not warrant discharging Monghate's counsel. In light of the trial court's inquiries, we conclude that the trial court did not abuse its discretion when it denied Monghate's motions to dismiss his counsel.[6]

Competency Hearing

Monghate argues that the trial court erred when it did not order an expert evaluation of his competency to stand trial when the issue arose during his first trial. Because Monghate did not offer new information demonstrating a change in his competency since a jury determined that he was competent, we disagree.

Due process prohibits the State from forcing an incompetent person to stand trial. U.S. CONST. amend. XIV; State v. Coley, 180 Wn.2d 543, 551, 326

---

[6] We also note that Monghate's counsel only requested the parts of the prior trial's transcript that she determined were relevant to Monghate's defense strategy. An attorney's choice of trial tactics and related matters are generally not sufficient to warrant dismissal of counsel. Cross, 156 Wn.2d at 606. We conclude that these grounds are insufficient to support Monghate's arguments that the trial court erred in declining to discharge his counsel.

P.3d 702 (2014); see also RCW 10.77.050. "'Incompetency' means a person lacks the capacity to understand the nature of the proceedings against him or her or to assist in his or her own defense as a result of mental disease or defect." RCW 10.77.010(15). If a reason to doubt the defendant's competency arises, a qualified expert or professional person approved by the prosecuting attorney shall be appointed to evaluate and report upon the defendant's mental condition. RCW 10.77.060(1)(a). "The determination of whether a competency examination should be ordered rests generally within the discretion of the trial court." In re Pers. Restraint of Fleming, 142 Wn.2d 853, 863, 16 P.3d 610 (2001).

Here, a jury found Monghate competent to stand trial. Once a determination of competency has been made, that determination will stand "unless it can be said that new information presented has altered the *status quo ante*.'" State v. Ortiz, 119 Wn.2d 294, 301, 831 P.2d 1060 (1992). Monghate did not present any such information challenging the prior determination or revealing that his competency status had changed.

Rather, Monghate's counsel only voiced her continuing concerns over Monghate's competency. Therefore, we conclude that the trial court did not abuse its discretion when it did not order a new competency evaluation during trial.

### Prosecutorial Misconduct

Monghate argues that the prosecutor committed misconduct several times during his closing argument. We will examine each of Monghate's arguments in turn.

As quasi-judicial officers, prosecutors must act impartially and insure that an accused person has a fair trial. State v. Warren, 165 Wn.2d 17, 27, 195 P.3d 940 (2008); State v. Boehning, 127 Wn. App. 511, 518, 111 P.3d 899 (2005).

"Where prosecutorial misconduct is claimed, the defense bears the burden of establishing the impropriety of the prosecuting attorney's comments and their prejudicial effect." State v. Brown, 132 Wn.2d 529, 561, 940 P.2d 546 (1997). In evaluating a claim of prosecutorial misconduct, the appellate court reviews the remarks "in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury." Brown, 132 Wn.2d at 561. "To establish prejudice, the defense must demonstrate there is a substantial likelihood the misconduct affected the jury's verdict." Brown, 132 Wn.2d at 561.

"Defense counsel's failure to object to the misconduct at trial constitutes waiver on appeal unless the misconduct is 'so flagrant and ill-intentioned that it evinces an enduring and resulting prejudice' incurable by a jury instruction." State v. Fisher, 165 Wn.2d 727, 747, 202 P.3d 937 (2009) (internal quotation marks omitted) (quoting State v. Gregory, 158 Wn.2d 759, 841, 147 P.3d 1201 (2006)). "[T]he absence of an objection by defense counsel 'strongly suggests to a court that the argument or event in question did not appear critically prejudicial to an appellant in the context of the trial.'" State v. McKenzie, 157 Wn.2d 44, 53 n.2, 134 P.3d 221 (2006) (quoting State v. Swan, 114 Wn.2d 613, 661, 790 P.2d 610 (1990)).

"Allegations of prosecutorial misconduct are reviewed under an abuse of discretion standard." State v. Brett, 126 Wn.2d 136, 174, 892 P.2d 29 (1995).

*Appealing to the Emotions of the Jury*

Monghate argues that the prosecutor committed misconduct by appealing to the emotions of the jury when he mentioned *intent to kill* and *attempted murder* during his closing argument. He principally relies on Boehning, where the Court of Appeals, Division Two, granted a new trial because the prosecutor in closing argument referred to evidence excluded and charges dismissed during trial. 127 Wn. App. at 519-23. Monghate maintains his situation is similar to the defendant in Boehning, in that here he was charged with arson not attempted murder. Because the prosecutor's statements did not constitute flagrant and ill-intentioned misconduct that could not have been cured by a jury instruction, we disagree.

Prosecutors must "seek convictions based only on probative evidence and sound reason." State v. Casteneda-Perez, 61 Wn. App. 354, 363, 810 P.2d 74 (1991). "Mere appeals to the jury's passion or prejudice are improper." Gregory, 158 Wn.2d at 808, overruled on other grounds by State v. W.R., Jr., 181 Wn.2d 757, 336 P.3d 1134 (2014).

During closing arguments, "'[c]ounsel are permitted latitude to argue the facts in evidence and reasonable inferences'" therefrom. State v. Dhaliwal, 150 Wn.2d 559, 577, 79 P.3d 432 (2003) (alteration in original) (quoting State v. Smith, 104 Wn.2d 497, 510, 707 P.2d 1306 (1985)). But counsel may not "make prejudicial statements that are not sustained by the record." Dhaliwal, 150 Wn.2d at 577.

A prosecutor may make inferential statements about a defendant's motive if the statements are based on the record. See, e.g., McKenzie, 157 Wn.2d at 58-59 (prosecutor's statements that defendant hoped to purchase victim's silence were permissible inferences from evidence of defendant pursuing a mediated settlement and considering finding a counselor in Canada for the victim). In addition, "the prosecutor, as an advocate, is entitled to make a fair response to the arguments of defense counsel." State v. Russell, 125 Wn.2d 24, 87, 882 P.2d 747 (1994).

Monghate suggested during his closing argument that Mitra and Sahba may have framed Monghate because they resented paying his rent. In rebuttal, the prosecutor stated that Monghate was offering an alternative to the State's theory of the case that Sahba "tried to kill his mother and tried to kill his sister when he set their home on fire as they slept" and that "somehow . . . [Mitra] must be in on it."[7]

Later in rebuttal, the prosecutor noted that Monghate used his mail to start the fire.[8] He then quoted Monghate's testimony that, "I don't stab you in the back. I stab you in the front."[9] The prosecutor stated, "When Devine went and asked Mitra, 'Do you know Kamran Monghate?' That question forever changed that family because he stabbed her in the front."[10]

When concluding his rebuttal argument, the prosecutor stated, "In opening, Defense said, 'The letter's not a confession.' And that's kind of true. It's not a

---

[7] 36 RP (May 5, 2016) at 3017.
[8] 36 RP (May 5, 2016) at 3023.
[9] 36 RP (May 5, 2016) at 3023.
[10] 36 RP (May 5, 2016) at 3023.

confession to arson. 'You and your family . . . die.' That's a confession to an attempted murder. And that's really what his intent was the first time he burnt that home down knowing that they were there. Knowing that they were vulnerable because they were asleep."[11]

Monghate did not object to any of these statements.

The prosecutor's reference to Monghate's intent to kill when setting the fire may have been improper because Monghate was not charged with attempted murder. Further, his arson charges and the aggravating factor alleged against him do not require the State to prove that he intended to kill a victim.

Yet unlike the prosecutor in Boehning, the prosecutor here discussed the charged crimes and the evidence admitted at trial. He also was responding to defense argument. The prosecutor's reference to Sahba attempting to kill Taraneh and his mother was a direct rebuttal to Monghate's closing argument, and thus was not improper. The prosecutor's description of Devine's question of Mitra closely mirrored Monghate's own testimony. Given that context, and the failure to object to the statements below, Monghate has not demonstrated that the prosecutor's statements rise to the level of flagrant and ill-intentioned misconduct. Any prejudice could have been cured by an instruction to the jury to disregard the reference to Monghate's possible intent to kill or to attempted murder.

Therefore, we conclude that the prosecutor's statements regarding intent to kill and attempted murder do not amount to reversible prosecutorial misconduct.

---

[11] 36 RP (May 5, 2016) at 3023-24.

*Shifting the State's Burden*

Monghate argues that the prosecutor committed misconduct when he improperly shifted the burden of proof to Monghate by arguing that there was no evidence disproving the State's case. Because the prosecutor's challenged remarks did not shift the burden of proof to Monghate, we disagree.

Requiring a defendant to establish a defense theory beyond the State's failure to meet its burden of proof, and produce evidence in support of that theory, infringes on the defendant's presumption of innocence. See State v. Walker, 182 Wn.2d 463, 479-80, 341 P.3d 976 (2015). The prosecution cannot comment on the lack of defense evidence. State v. Cheatam, 150 Wn.2d 626, 652, 81 P.3d 830 (2003). But "the prosecutor, as an advocate, is entitled to make a fair response to the arguments of defense counsel." Russell, 125 Wn.2d at 87.

"Arguments by the prosecution that shift or misstate the State's burden to prove the defendant's guilt beyond a reasonable doubt constitute misconduct." State v. Lindsay, 180 Wn.2d 423, 434, 326 P.3d 125 (2014); see also State v. Miles, 139 Wn. App. 879, 890, 162 P.3d 1169 (2007) ("[I]t is flagrant misconduct to shift the burden of proof to the defendant," and a prosecutor commits misconduct if the "prosecutor's argument presented the jurors with a false choice, that they could find [the defendant] not guilty only if they believed his evidence.").

During his closing argument, the prosecutor challenged Monghate's expert's comparison of samples taken from the arson scene and accelerants taken

from Monghate's residence.[12] Monghate's expert had testified that the samples did not match, because the arson scene samples produced lower carbon numbers.

The prosecutor argued that the comparison was invalid because Monghate's expert had relied on the State's analysis of the arson scene samples, and the State's expert had testified that the State's tests could only produce certain numbers.[13] Monghate objected to the argument on burden shifting grounds, which the trial court overruled. In his closing argument, Monghate contended that the State had not been precluded from conducting tests that could have produced higher carbon numbers.

The prosecutor's comments about Monghate's expert's testimony concerned the data on which he relied in making his comparison. Specifically, the prosecutor explained the difference in the carbon numbers by noting that the State's expert had testified to a reason for the discrepancy other than the samples containing different substances. The prosecutor did not argue that Monghate had to produce evidence to prove his innocence; rather, the prosecutor's argument explained why Monghate's expert's comparison was unpersuasive. Therefore, the prosecutor's statement did not improperly shift the burden to Monghate by requiring him to produce evidence to prove his innocence. We conclude that the

---

[12] The carbon numbers of the arson scene samples went up to 18. The carbon numbers of the accelerant samples taken from Monghate's residence went up to 22.

[13] The State had used a "PAE strip" to test the debris, which limited the carbon numbers produced to 18. 36 RP (May 5, 2018) at 2985. Monghate's expert's testing produced carbon numbers up to 22. The State also noted that Monghate's expert "said that the manner in which you test things can greatly influence whether or not it's appropriate to compare them." 36 RP (May 5, 2018) at 2985.

prosecutor's statements about Monghate's expert's comparison were not improper.

Separately, as discussed above, during his closing argument Monghate suggested that Mitra and Sahba had framed him for financial reasons. In rebuttal, the prosecutor stated that Monghate was arguing an alternative theory to the State's case. Monghate did not object to this statement.

The prosecutor did not tell the jury that it had to choose between the two theories. The prosecutor noted that the "burden is all on the State" and did not argue that Monghate had to produce evidence proving his innocence.[14] Further, the prosecutor was making a reasonable response to Monghate's closing argument when he made this argument. Russell, 125 Wn.2d at 87. We conclude that the prosecutor's comment did not constitute flagrant and ill-intentioned misconduct that could not have been cured by an instruction.

*Vouching for Witnesses*

Monghate argues that the prosecutor committed misconduct by improperly vouching for the credibility of witnesses or expressing personal opinion by using the phrase "we know" on multiple occasions.[15] Because the prosecutor's use of "we know" properly referred to testimony and evidence in the record, we disagree.

"It is improper for a prosecutor personally to vouch for the credibility of a witness." Brett, 126 Wn.2d at 175.

Although individual statements of a prosecutor may sound like expressions of personal opinion standing alone, they must be examined in light of the total

---

[14] 36 RP (May 5, 2016) at 3017.
[15] 36 RP (May 5, 2016) at 3017-18.

argument, the issues in the case, the evidence discussed during the argument, and the trial court's instructions. McKenzie, 157 Wn.2d at 53-54. "'Prejudicial error does not occur until such time as it is *clear and unmistakable that counsel is not arguing an inference from the evidence, but is expressing a personal opinion.*'" McKenzie, 157 Wn.2d at 54 (quoting State v. Papadopoulos, 34 Wn. App. 397, 400, 662 P.2d 59 (1983)).

Although a prosecutor should avoid using "we know" because it "'readily blurs the line between improper vouching and legitimate summary,'" he or she may use the phrase to marshal evidence or draw reasonable inferences from the evidence. State v. Robinson, 189 Wn. App. 877, 894-95, 359 P.3d 874 (2015) (quoting United States v. Younger, 398 F.3d 1179, 1191 (9th Cir. 2005)). The prosecutor may not use the phrase "we know" to imply "'special knowledge'" of facts outside the record "'or express a personal opinion.'" Robinson, 189 Wn. App. at 895 (quoting United States v. Bentley, 561 F.3d 803, 812 (8th Cir. 2009)).

During closing argument, the prosecutor first used the phrase "we know" to rhetorically ask the jury, "The question is is [sic] how is it that we know that Kamran Monghate, . . . how it is that we know that he is the one that actually committed these offenses. That's the question for you to answer."[16] He then used the phrase to emphasize key testimony and pieces of evidence in the record or a lack thereof. Finally, the prosecutor highlighted the reliability of the State's testing methodology and analysis of the DNA samples. Monghate did not object to any of the prosecutor's uses of "we know."

---

[16] RP (May 5, 2016) at 2973.

The prosecutor's uses of "we know" did not constitute improper vouching or expressions of personal opinion, and did not rise to the level of flagrant and ill-intentioned misconduct that could not have been cured by a jury instruction. The prosecutor used the phrase rhetorically at the beginning of his argument, and subsequently used it to refer to testimony and evidence in the record.[17] Moreover, even if the prosecutor's use of "we know" is considered improper, any prejudice could have been substantially reduced if Monghate had objected to the prosecutor's first use of the phrase or requested a curative instruction. We conclude that the prosecutor's use of the phrase "we know" did not constitute reversible prosecutorial misconduct.

*Denigrating Defense Counsel*

Monghate argues that the prosecutor committed misconduct by denigrating Monghate's counsel. Because the prosecutor was reasonably responding to an argument by Monghate's counsel, we disagree.

"It is improper for the prosecutor to disparagingly comment on defense counsel's role or impugn the defense lawyer's integrity." State v. Thorgerson, 172 Wn.2d 438, 451, 258 P.3d 43 (2011) (prosecutor impugned defense counsel's integrity, "particularly in referring to his presentation of his case as 'bogus' and involving 'sleight of hand,'" but the misconduct was not likely to have prejudiced the defendant).

As discussed above, Monghate suggested that Sahba and Mitra had framed Monghate for financial reasons. In rebuttal, the prosecutor stated, "[I]t is absurd

---

[17] On appeal, Monghate acknowledges that "the prosecutor used this phrase to argue the evidence supported convicting Mr. Monghate." Appellant's Opening Br. at 48.

and insulting to suggest that Mitra and Sahba and their son are in on trying to kill Taraneh and Mom for $400 a month. It's absurd."[18] Monghate did not object to the prosecutor's statement.

Monghate suggested that Mitra, Sahba, and their son could have put their relatives' lives in danger for purely financial reasons. The prosecutor's response expressed disbelief in Monghate's alternative theory. The prosecutor did not return to this point or otherwise impugn the integrity of Monghate's counsel. Therefore, even if the prosecutor's comment is considered improper, the comment does not constitute flagrant and ill-intentioned misconduct that could not have been cured by an instruction to the jury. We conclude that the prosecutor's comment does not constitute reversible prosecutorial misconduct.

### Evidence Supporting Aggravating Factor

Monghate argues that there was insufficient evidence at trial to support the jury's finding of the aggravating factor charged against him for the March 18 arson. We conclude any rational trier of fact could have found the evidence was sufficient.

"A person is guilty of arson in the first degree if he or she knowingly and maliciously . . . [c]auses a fire or explosion which damages a dwelling." RCW 9A.48.020(1)(b). An aggravating factor that can support a sentence above the standard range is "[t]he defendant knew or should have known that the victim of the current offense was particularly vulnerable or incapable of resistance." RCW 9.94A.535(3)(b).

---

[18] 36 RP (May 5, 2016) at 3018.

"We use the same standard of review for the sufficiency of the evidence of an aggravating factor as we do for the sufficiency of the evidence of the elements of a crime." State v. Zigan, 166 Wn. App. 597, 601, 270 P.3d 625 (2012). "[W]e review the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the presence of the aggravating circumstances beyond a reasonable doubt." Zigan, 166 Wn. App. at 601-02.

Here, the evidence at trial established that the March 18 fire occurred after Taraneh went to bed around midnight and both she and her elderly mother were asleep. The home's bedrooms were located on the second floor, and one stairway led down to the ground floor. One of the fire's ignition points would have blocked the staircase leading down from the second story of the home. Monghate had helped build the home at which the March 18 arson occurred.

The evidence at trial established Monghate knew or should have known that the occupants of the home, one of whom was an elderly person, were asleep upstairs. He then set a fire that would have blocked their only way to the ground floor of the home. The placement of the fire in particular, in light of his knowledge of the layout of the home and the characteristics of the victims, indicates that the victims' vulnerability was a substantial factor motivating Monghate's commission of the crime. Taken as true and viewed in the light most favorable to the State, there was sufficient evidence at trial that any rational jury could have found the facts underlying the aggravating factor beyond a reasonable doubt.

Monghate argues that the aggravating factor of a particularly vulnerable victim only applies when the victim was chosen precisely because of the

vulnerability and inability to defend himself or herself.[19] We disagree. Taraneh's mother was particularly vulnerable because she was unable to quickly react to the arson. Monghate's placement of a source of ignition near the only stairway leading down from the second floor of the home, where both victims were asleep, indicates that the victims' vulnerability was a substantial reason motivating his offense.

In sum, we conclude that there was sufficient evidence at trial that any rational jury could have found the facts underlying the aggravating factor alleged against Monghate beyond a reasonable doubt.[20]

<u>Excessive Sentence</u>

Monghate argues that the trial court erred when it imposed a clearly excessive sentence for the count I March 18 arson with the aggravating factor. Because the jury's finding of the aggravating factor was supported by substantial

---

[19] Monghate cites <u>State v. Gordon</u>, 172 Wn.2d 671, 680, 260 P.3d 884 (2011) (in second-degree murder case, evidence was sufficient to support finding of aggravating factor where witnesses testified that victim was unable to defend himself while outnumbered during fatal beating); <u>State v. Berube</u>, 150 Wn.2d 498, 512-14, 79 P.3d 1144 (2003) (sufficient evidence supporting aggravating factor in homicide abuse case where 23-month-old victim was completely dependent upon defendants for well-being and was unable to communicate to other adults about abuse); and <u>State v. Hicks</u>, 61 Wn. App. 923, 930-31, 812 P.2d 893 (1991) (sufficient evidence supporting aggravating factor in first degree rape case where one victim was elderly and another was attacked while she was sleeping).

[20] Monghate also contends that the prosecutor, while discussing the jury instructions with the court and in his closing argument, stated that the victims' specific vulnerability was premised on their being asleep. Monghate argues that, therefore, the State was restricted to this ground in establishing the facts justifying the aggravating factor. In reviewing the sufficiency of the evidence supporting an aggravating factor, this court reviews the entirety of the evidence relevant to determine whether there was sufficient evidence to support the jury's finding. <u>See</u> <u>Zigan</u>, 166 Wn. App. at 601-02. The nature of this inquiry does not rely on the prosecutor's summary of supporting evidence while discussing jury instructions with the trial court or in closing argument with the jury. Therefore, we reject Monghate's argument.

evidence and the trial court noted multiple circumstances justifying an exceptional sentence, we disagree.

The purposes of the Sentencing Reform Act of 1981 (SRA) include "[ensuring] that the punishment for a criminal offense is proportionate to the seriousness of the offense and the offender's criminal history; . . . [is] just; [and] commensurate with the punishment imposed on others committing similar offenses." RCW 9.94A.010(1)-(3).

"The court may impose a sentence outside the standard sentence range for an offense if it finds, considering the purpose of [the SRA], that there are substantial and compelling reasons justifying an exceptional sentence." RCW 9.94A.535. An aggravating factor that can support a sentence above the standard range is "[t]he defendant knew or should have known that the victim of the current offense was particularly vulnerable or incapable of resistance." RCW 9.94A.535(3)(b).

"A sentence is clearly excessive if it is based on untenable grounds or untenable reasons, or an action no reasonable judge would have taken." State v. Branch, 129 Wn.2d 635, 649-50, 919 P.2d 1228 (1996).

The question of whether a sentence is clearly excessive is reviewed for abuse of discretion. State v. Law, 154 Wn.2d 85, 93, 110 P.3d 717 (2005).

As a first time offender, Monghate's standard range sentence was 31 to 41 months. In light of the aggravating factor, the State requested an exceptional sentence on count I of 120 months. The trial court followed the State's recommendation and imposed a total of 120 months of incarceration.

Here, as discussed above, the jury's finding of the aggravating factor that Monghate's victims were particularly vulnerable was supported by substantial evidence. Thus, the trial court was authorized to impose a sentence outside the standard range. The trial court considered a variety of circumstances in determining the appropriate length of Monghate's sentence, including the significant evidence against Monghate and that setting two separate fires demonstrated Monghate's unwillingness to stop blaming Sahba for his troubles.[21] The trial court's reliance on the jury's finding of the aggravating factor and its consideration of other circumstances indicate that its sentence was not based on untenable grounds or reasons. We conclude that the trial court did not abuse its discretion in imposing an exceptional sentence.[22]

---

[21] Monghate argues that the State offered improper arguments justifying an exceptional sentence, including Monghate's future dangerousness, the length of time taken to restore Monghate to competency and prosecute him, the possibility that Monghate would be released immediately if he was not given an exceptional sentence, and that Monghate may receive services while incarcerated.

This is unpersuasive. The trial court did not adopt the State's reasons that Monghate has challenged as improper. For example, the trial court stated that Monghate would receive mental health treatment while incarcerated, and hoped that he would be "stabilized in a way that will give him a future when he's released." 39 RP (July 8, 2016) at 3097. This was not given as a justification for the exceptional sentence. Further, as discussed above, the trial court was justified in imposing an exceptional sentence on Monghate following the jury's finding of the aggravating factor alleged against him.

[22] Monghate has argued below and on appeal that his sentence is clearly excessive because other cases involving first-time offenders convicted of arson did not result in exceptional sentences. This is unpersuasive.

"The purpose of the SRA is to structure, but not eliminate, discretionary trial court decisions." State v. Ritchie, 126 Wn.2d 388, 397, 894 P.2d 1308 (1995) (citing RCW 9.94A.010). "Comparison with, but more importantly limitation by, standard sentences is inconsistent with the trial court having found substantial and compelling reasons to justify an exceptional sentence." Ritchie, 126 Wn.2d at 397.

In the present case, as discussed above, the jury's finding of the aggravating factor alleged against Monghate was supported by sufficient evidence. The trial court imposed an exceptional sentence upon Monghate based on this aggravating factor. Therefore, Monghate's reliance on prior arson cases in which exceptional sentences were not imposed cannot demonstrate an abuse of discretion by the trial court in the present case.

25

## Violation of Brady v. Maryland

Monghate argues that the trial court erred when it denied his motion for dismissal or a new trial because the State withheld material evidence in violation of Brady, 373 U.S. 83. Because the evidence at issue was not material under Brady, we disagree.

"[S]uppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. The defendant need not request the evidence, and "the duty encompasses impeachment evidence as well as exculpatory evidence" that is known to either the prosecutor or police investigators. Strickler v. Greene, 527 U.S. 263, 280-81, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999).

When claiming a violation of Brady, a defendant must establish that "'[(1)] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [(2)] that evidence must have been suppressed by the State, either willfully or inadvertently; and [(3)] prejudice must have ensued.'" State v. Mullen, 171 Wn.2d 881, 895, 259 P.3d 158 (2011) (alterations in original) (quoting Strickler, 527 U.S. at 281-82).

Under the third element of a Brady violation claim, "'[t]he terms "material" and "prejudicial" are used interchangeably.'" Mullen, 171 Wn.2d at 897 (internal quotation marks omitted) (quoting United States v. Price, 566 F.3d 900, 911 n.12 (9th Cir. 2009). Evidence is material "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would

have been different.'" Mullen, 171 Wn.2d at 897 (internal quotation marks omitted) (quoting Kyles v. Whitley, 514 U.S. 419, 433-34, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)). A reasonable probability exists if the suppression of the evidence, viewed collectively, "'undermines confidence in the outcome of the trial.'" Mullen, 171 Wn.2d at 897 (internal quotation marks omitted) (quoting Kyles, 514 U.S. at 434).

A Brady violation claim is reviewed de novo on appeal. Mullen, 171 Wn.2d at 893.

After his conviction, upon learning that Devine had been terminated for cause from the Washington State Patrol Academy following an allegation of cheating, Monghate moved for dismissal or a new trial. Through public disclosure requests, Monghate determined that Devine had been terminated for cause from the academy in 1996, and he had reapplied in 2004 without disclosing that he had previously been terminated for cause. Devine had disclosed this incident to the King County Sheriff's Office when he applied to work as an arson investigator. Devine had not revealed this history during a defense interview prior to Monghate's trial.

In June 2016, in response to Monghate's motion, Devine declared under penalty of perjury that he had been accused of cheating on his final exam at the academy, had immediately appealed, and had been exonerated by an administrative law judge. He declared that the administrative law judge had found no evidence supporting the allegation of cheating.

Devine did not provide documentary evidence of the administrative hearing.

27

He declared that he had lost the administrative law judge's decision when he moved residences, and that the attorney who had represented him had retired and could not be located. He declared that the State had destroyed his file due to the length of time that had elapsed since the hearing.

Here, the State's failure to produce the evidence of the allegation of cheating against Devine did not violate <u>Brady</u> because the evidence was not material. The allegation of cheating against Devine was made in 1996, approximately 20 years before Monghate's trial. The trial court found that the witnesses against Devine "said they saw Devine writing on a desk days before the test was taken. These witnesses claimed that, although writing on the desk raised red flags, they didn't know what had really happened."[23] Further, although Devine was terminated for cause from the academy, he declared under penalty of perjury that he immediately disputed the allegation and was exonerated by an administrative law judge because there was no evidence of cheating.[24]

In sum, the State's failure to produce evidence of the allegation of cheating against Devine and his subsequent termination from the academy does not undermine confidence in the outcome of Monghate's trial. There is no reasonable probability that evidence of the allegation of cheating against Devine and related

---

[23] CP at 1651.

[24] Monghate argues that Devine's sworn declaration is insufficient because it is not supported by other evidence. Appellant's Opening Br. at 2 (challenging trial court's finding that Devine was exonerated because "no evidence supports Investigator Devine's unsubstantiated claim of exoneration"); Appellant's Opening Br. at 25 ("Investigator Devine made a declaration that he was cleared of the misconduct in an administrative hearing, but no such evidence exists."). Monghate does not cite legal authority or offer substantive argument challenging the validity of Devine's declaration, and has not offered contrary evidence. RAP 10.3(a)(6). We reject Monghate's contention that Devine's declaration is insufficient.

28

incidents would have changed the outcome of Monghate's trial.[25] We conclude that the evidence was not material under Brady, and thus cannot support Monghate's claim of a Brady violation.[26]

## Legal Financial Obligations (LFOs)

Monghate argues that the trial court erred when it failed to make an individualized inquiry into whether his LFOs should be waived because of his mental health condition. Because Monghate did not raise this issue below, we decline to reach the merits of his argument.

"The appellate court may refuse to review any claim of error which was not raised in the trial court." RAP 2.5(a).

"Before imposing any legal financial obligations upon a defendant who suffers from a mental health condition, other than restitution or the victim penalty

---

[25] The parties dispute whether evidence of the allegation of cheating against Devine and his termination from the academy would have been admissible at trial. The evidence at issue must be admissible to support a Brady violation claim. See Wood v. Bartholomew, 516 U.S. 1, 6, 116 S. Ct. 7, 133 L. Ed. 2d 1 (1995). Monghate argued below that the evidence was admissible under ER 608(b), but the trial court rejected this argument. Because we conclude that the evidence at issue is not material under Brady, we decline to reach the issue of whether the evidence would have been admissible under ER 608(b) or evaluate the trial court's findings pertaining to admissibility.

[26] Monghate also argues that Devine's failure to inform the academy of his prior termination for cause when he reapplied in 2004 is also a basis for a Brady violation claim. This is unpersuasive.

Devine declared that he had not filled out the 2004 application to the academy, and was not aware of its contents until June 28, 2016. The application was completed and signed by Lawrence Canary, not Devine. As discussed above, Monghate has not demonstrated that Devine's declaration is invalid and has not offered evidence rebutting its content.

Thus, although the information in the 2004 academy application was erroneous, any dishonesty was not attributable to Devine and was not probative on the issue of his credibility. We conclude that the inaccurate 2004 academy application cannot support Monghate's Brady violation claim.

assessment under RCW 7.68.035, a judge must first determine that the defendant . . . has the means to pay such additional sums." RCW 9.94A.777(1).

The question of whether a trial court properly inquired into a defendant's ability to pay due to a mental health condition is subject to RAP 2.5(a). State v. Tedder, 194 Wn. App. 753, 756, 378 P.3d 246 (2016).

Here, the trial court imposed mandatory LFOs consisting of restitution, the victim penalty assessment, and a $100 DNA fee. Monghate did not challenge the imposition of the DNA fee below under RCW 9.94A.777. Therefore, we decline to reach the merits of his argument.

## Cumulative Error

Monghate argues that cumulative error denied him of his Fourteenth Amendment right to a fair trial. "Cumulative error may warrant reversal, even if each error standing alone would otherwise be considered harmless." State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). Because Monghate has not prevailed on his claims of error on appeal, we conclude that cumulative error did not deprive Monghate of a fair trial.

Affirmed.

Trickey, J.

WE CONCUR:

30