## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,      )
                                    )
            Respondent,      )   No. 78398-0-I
                                    )
           v.                    )   DIVISION ONE
                                    )
JARON LAMAR COX,        )   UNPUBLISHED OPINION
                                    )
           Appellant.        )   FILED: February 3, 2020
_____ )

SMITH, J. — Jaron Cox was convicted of attempted murder in the first degree for shooting Alden Gibbs. On appeal, he argues that his conviction must be reversed because the evidence was insufficient to support a finding that he acted with premeditated intent to cause Gibbs's death. He argues in the alternative that a new trial is warranted because the to-convict instruction relieved the State of its burden to prove premeditation, the State withheld material impeachment evidence, the trial court excluded Cox's exculpatory statement to an officer, and the prosecutor committed misconduct during closing.

We conclude that the evidence was sufficient, when viewed in the light most favorable to the State, to support a finding that Cox acted with premeditated intent to cause Gibbs's death. We also conclude that the to-convict instruction was adequate, that the impeachment evidence withheld by the State was not material in light of the record in this case, and that both the exclusion of Cox's

exculpatory statement and the prosecutor's statements during closing were harmless. Therefore, we affirm.

## FACTS

This case arises out of a shooting that occurred at 2:17:40 a.m. on January 16, 2017, in the Pioneer Square neighborhood of Seattle. The shooting occurred near the southwest corner of a building located at 164 South Washington Street (Fuel building). The Fuel building is situated on the north side of South Washington Street. It houses multiple bars, including Stage nightclub and Fuel, which is located in the southwest corner of the Fuel building. Just west of the Fuel building, on the same block, is a parking lot (parking lot) that is separated from the Fuel building by an alley, where the shooting took place.

Earlier that morning, around 1:00 or 1:30 a.m., a group of Seattle police officers, including Officers Victor Pirak and Jennifer Hunt, were standing on the south side of South Washington Street in front of McCoy's Firehouse bar, across the street from and slightly east of Fuel. The officers were there to "try to monitor and talk to people and identify where problems may arise" as the bars in that area began to close. At some point, the officers became aware of a fight breaking out near Fuel. Officer Pirak saw what he later described as "a commotion where people were actually starting to put hands on each other" occurring on the southwest corner of the Fuel building. Another officer later testified that, at the corner of the Fuel building, he "saw two black males fighting one another" and "throwing punches at each other." Some of the officers, including Officer Pirak and Officer Hunt, began walking along the south sidewalk

of South Washington Street, in the direction of the fight. As Officer Pirak walked in that direction, he "saw the physical altercation become more grabbing on." He "thought [he] saw a swing," and he "saw somebody get kind of pulled down and maybe people trying to pull him off." Officer Pirak then heard "a number of rounds being fired." The shots sounded to Officer Pirak like they were coming from the parking lot.

Officer Pirak took cover behind a car. As he did so, Officer Hunt ran past him. Officer Pirak also saw another officer, Scott Barker, moving along the north sidewalk in front of Fuel. Officer Pirak thought that would be a safer position, so he came around the car he had taken cover behind and crossed the street. As Officer Pirak approached the Fuel building he saw a man, later identified as Gibbs, lying on the ground where the fight had been happening. Gibbs had suffered multiple gunshot wounds. Although he survived, he is unable to walk.

Officer Barker also "heard multiple gunshots coming from th[e] location where the fight was." He "drew [his] gun and . . . immediately started going there." As he rounded the corner of the Fuel building, he saw a large black SUV facing him, parked facing southbound in the alley. He "immediately started scanning the area looking for the threat." He later testified that he looked northwest into the parking lot and saw a man, later identified as Cox, "walking west through the parking lot kind of nonchalantly, calmly, when everyone else was kind of frantic because there was gunshots." Officer Barker testified that he made eye contact with Cox, who started running through the parking lot toward a Camaro that was parked in the lot. Cox was accompanied by a woman, later

identified as Princess Combs, who got into the driver's side of the Camaro. Officer Barker testified that he saw what appeared to be Cox trying to hand something to Combs, and Combs making facial expressions and hand motions indicating that she did not want to accept whatever it was Cox was trying to hand her. Cox then ran behind the Camaro and ducked. At this point, Officer Barker had his gun out and was yelling for Cox to show him his hands and get on the ground. Cox ultimately complied, and Officer Barker handcuffed Cox behind the Camaro on his stomach. Officer Hunt later testified that she saw the shooting and witnessed the shooter turn and flee into the parking lot. She also testified that she did not lose sight of the shooter from the time that she saw him shooting until the time that Officer Barker arrested him, i.e., Cox.

Officer Barker testified that after he arrested Cox, he looked underneath the Camaro "and approximately 2 feet from where Mr. Cox was there was a pistol with the slide locked to the rear, and so [Officer Barker] confiscated that." According to a later-filed probable cause statement, "Cox immediately told Officer Barker that the gun was not his and that someone gave him the gun to hide."

At the time of his arrest, Cox was wearing a black jacket with large, white cursive lettering across the back. The gun recovered from under the Camaro, a "9-millimeter Luger caliber Glock semi-automatic pistol," was later confirmed as the gun used to shoot Gibbs.

The State charged Cox with one count of attempted murder in the first degree and one count of assault in the first degree, in each case while armed with a firearm. Prior to trial, the State moved to exclude, if offered by Cox,

4

evidence of Cox's statement to Officer Barker that he had been given the gun to hide. The State contended that Cox's statement was hearsay and did not fall under any recognized hearsay exception. In response, Cox argued that the statement was admissible as an excited utterance; he also argued that it was not hearsay because he was offering it not for the truth of the matter asserted but to show that the subsequent police investigation was inadequate. The trial court excluded the statement, explaining, "I don't see it has relevance for a non-hearsay purpose."

At trial, Gibbs testified that on the evening of the shooting, his friends talked him into going out to Stage nightclub. Stage was holding an "all-black party" that night, "meaning everybody was wearing black . . . clothing." Gibbs and his friends arrived around 12:15 or 12:20 a.m. Gibbs did not see any altercations in the club, but toward the end of the night, he heard that things would be ending early because someone was "attacking females." Gibbs and his friends decided to leave. As they exited Stage, Gibbs asked a friend to get his car. Gibbs, meanwhile, planned to escort Libby Pinder, a friend that he had seen in the club earlier, to her car.

Pinder, who also testified, recalled that as she and Gibbs were walking toward the parking lot, "there was a dude that was riled up." Pinder described him as "African-American and kind of chubby" and heavier than Gibbs. Gibbs described the man as "about six-foot, if that. Maybe six-one. Probably 50 pounds more than me. . . . I don't want to say that he's solid, you know, but he's a bigger, heavy-set guy." Pinder recalled saying to Gibbs, "'I think that's the guy

5

that was in there that was riled up. I think so.'" Pinder testified that the man heard her and "started saying unpleasant things to [her,] and [Gibbs] started sticking up for [her]."

Gibbs testified that the man said something to him like, "'Well, you trying to save these girls or something? I'll slap you.'" Gibbs looked at the man and "was just like, you know, like, 'You know, whatever.'" As Gibbs and Pinder walked off, Gibbs looked back and saw the man "kind of walking up on me." Gibbs expressed that he did not want to fight, but testified that the man "was determined to fight." Gibbs had never seen the man before. Gibbs tried to stay calm, but then the man swung at him and a fight broke out. Gibbs recalled that when the man first swung at him, they were at the entrance of the alley between the Fuel building and the parking lot.

Gibbs testified that as the man was swinging at him, Gibbs was swinging back, and eventually Gibbs "knocked him" and he fell on a black SUV that was in the alley. According to Gibbs, the SUV backed up and the man fell onto the ground. Gibbs testified that the next thing he remembers—after confirming that the man was on the ground and no longer a threat—was that Gibbs "heard one gunshot and . . . was laying on the ground." Gibbs "never felt the gunshot" but knew that he "was on the ground and everybody was screaming at [him]." Gibbs recalled taking the ambulance to Harborview Medical Center, where he was treated for multiple gunshot wounds. The surgeon who treated Gibbs at the hospital testified that although he could not offer an opinion as to the relative positions of Gibbs and the person who fired the weapon, "[i]t looks, according to

the CT scans and the injuries, the bullet entry wounds were from the back." An officer who collected evidence at the scene testified that fresh chips found in the concrete indicated "somebody pointing down at somebody that had fallen and then continuing to shoot."

When Gibbs awoke in the hospital, he heard that the person he was fighting with was someone known as "Big Mike." Other witnesses also testified that they later heard the name "Big Mike" in connection with the fight.

During trial, the State introduced an in-car video from Officer Barker's patrol car (IC video). Officer Barker had, about six minutes before the shooting, parked his car across South Washington Street to block traffic. He parked his car so that it was facing north into the parking lot. Thus, the IC video captured certain events occurring in the parking lot before and after the fight and the shooting. The IC video does not, however, capture the part of the alley where the shooting occurred.

The State also introduced a second video (Weyerhaeuser video) from a surveillance camera mounted on the Weyerhaeuser building, which is located across the street to the south of the parking lot. The Weyerhaeuser video captures the eastern part of the parking lot, the alley entrance where the fight occurred, and the southwest corner of the Fuel building. The Weyerhaeuser video was taken from a slightly higher perspective than the IC video; however, its view of the parking lot begins essentially where the IC video's view ends. That is, if a person were to walk eastward across the parking lot toward the alley and the Fuel building, that person would be seen first on the IC video, walking from

left to right. That person would then disappear from the right side of the IC video's frame and appear on the left side of the Weyerhaeuser video's frame at approximately the same time.[1]

In the IC video, a Camaro, which Cox later testified was his, can be seen parked in the parking lot facing Officer Barker's patrol car. Also seen in the IC video, about four minutes before the shooting, are two men, one of whom Cox later identified as himself, walking together in the parking lot. Cox is wearing black pants and a black jacket with white lettering on the back. The other man is heavier-set and wearing a short-sleeved black shirt and light pants. About a minute and a half before the shooting (at 2:16:13 a.m. on the IC video), Cox can be seen walking by himself across the parking lot away from his Camaro toward the alley. Before he gets there, he turns around and begins walking back toward the Camaro. On his way there, at 2:16:24 a.m., he passes a heavier-set man wearing a short-sleeved black shirt and light pants who is walking the other way, toward the alley. The heavier-set man continues walking toward the alley, and just after 2:16:29 a.m., he stops at the very right edge of the IC video and pauses for about 10 seconds before disappearing from the IC video's frame.

Meanwhile, at 2:16:30 a.m. on the Weyerhaeuser video, what appears to

---

[1] Both the IC video and the Weyerhaeuser video are time stamped, and their time stamps are consistent within one second of one another. For example, a man wearing a reddish hat and sweatshirt can be seen running west away from the shooting and disappearing from the left side of the Weyerhaeuser video at 2:17:48 a.m., according to that video's time stamp. The same man appears on the right side of the IC video, still running away from the shooting, just before the IC video's time stamp (which displays only every two to three seconds) flashes 2:17:48 a.m.

be the same, heavier-set man can be seen walking toward the alley and stopping next to a car. He pauses for about 10 seconds before crossing in front of the car, continues walking toward the alley, and disappears behind a utility box. About six seconds later, what appears to be the same man reemerges from behind the utility box, still walking toward the alley, and crosses the alley in front of a black SUV that has just driven down the alley to the alley entrance. The man then stops next to two people—who Gibbs later identified as himself and Pinder—at the southwest corner of the Fuel building and appears to begin talking to them. The three appear to keep talking as they move in front of the black SUV, which is still stopped at the alley entrance. At 2:17:16 a.m., the heavier-set man moves rapidly toward Gibbs and Pinder, and at 2:17:23 a.m., a fight breaks out. Although the Weyerhaeuser video has no audio, it is apparent that the fight has caught the attention of many people, including a number of individuals walking along the south side of the street, who turn to look in the fight's direction.

Turning back to Cox and the IC video: After Cox passes the heavier-set man in the parking lot at 2:16:24 a.m. as Cox walks back toward his car, he continues walking toward the Camaro and then opens the trunk. The trunk remains open for about 15 seconds until Cox closes it and begins walking back across the parking lot toward the alley. He is still wearing a black jacket with white lettering on the back and black pants. Just before the IC video's time stamp displays 2:17:24 a.m., i.e., just after the fight breaks out in the alley, Cox, still walking toward the alley, disappears from the right-hand side of the IC video's frame.

9

At about the same time, a man enters the frame of the Weyerhaeuser video from the left, walking across the parking lot toward the alley. As he continues walking toward the alley, it is apparent that he is wearing a black jacket with white lettering on the back. When the prosecutor played this portion of the Weyerhaeuser video for Cox during his testimony and asked if he saw "that individual with the white lettering on the back," Cox responded, "No."

The man with the black jacket disappears behind the utility box at 2:17:28 a.m. About six seconds later, what appears to be the same man emerges from behind the utility box, walks into the alley where the fight continues, and extends his arm out in front of him. The white lettering on the back of his jacket is visible, though illegible, as he does so. The time stamp on the Weyerhaeuser video displays 2:17:39 a.m. Meanwhile, on the IC video, a series of 12 bangs can be heard, concluding just after the time stamp flashes 2:17:40 a.m. On the Weyerhaeuser video, the man lowers his arm at 2:17:41 a.m. and moves back toward the parking lot. People walking on the south sidewalk across the street from the alley begin to duck and run. About five seconds later, Cox is seen on the IC video running away from the alley across the parking lot to his Camaro, where Officer Barker ultimately arrests him.

Cox denied being the apparent shooter seen extending his arm in the Weyerhaeuser video. He testified that when he was seen in the IC video opening his trunk, it was to get a couple of "little airplane alcohol" shots from a birthday gift basket that his mother had bought him. He testified that when he disappeared from the frame of the IC video (at about 2:17:24 a.m.), he was

10

headed back toward the front of the club when he ran into a friend, Leondis Major. He then opened and drank a shot and offered another one to Major. When asked what happened next, Cox testified, "I didn't get all the way in the club. I got to the first part of the alley and that's when the shots went off." He recalled that he then "hit the deck, hit face down on the ground." He testified that when he was on the ground, some time passed and then he remembered seeing a gun being tossed toward him. He looked up and saw "a guy running north up the alley" who said "'Grab it' or 'Pick it up' or something like that." Cox testified that he then picked up the gun, ran back toward his car, and dumped the gun there. Cox testified that he did not recognize the person who tossed the gun to him but that it was a black male wearing a jacket similar to his. He also testified that he was not aware that there was a fight going on.

Cox testified that although he and Gibbs knew people in common, he did not know Gibbs. Cox also testified on direct examination that he did not know Big Mike, who was later identified as Mike Williams. Specifically, Cox testified that although he had heard of Big Mike because "[h]e has some type of rep in the streets[,]" that was "about it" and he "d[id]n't know who he [wa]s." When asked on direct whether he could "put a face to" Big Mike's name, Cox answered no.

On cross-examination, Cox confirmed his testimony that the shooter ran up the alley. Cox also reiterated that he did not know Mike Williams or anyone named Big Mike and that he had no connection "at all" with Big Mike. When shown a picture of Mike Williams's identification, Cox testified that "[n]ow that you put a face to him, I've seen him around" but continued to insist that he did not

11

know him personally. The State then showed Cox a photograph, dated February 2014, from Cox's Instagram account. In it, Cox appears with four other men, one of whom Cox acknowledged was Big Mike. Cox also volunteered that the person standing next to Big Mike in the photo was Big Mike's cousin and ultimately acknowledged being "real good friends with [Big Mike's] cousin."

During closing, the prosecutor played the IC video and argued as follows:

> [PROSECUTOR]: You can see him walking right here in the middle of the street with this man. This man who is wearing a black short-sleeved shirt and lighter-colored pants that appear to be blue jeans on this screen. They're walking together and they appear to be talking. They stop next to this vehicle together and they linger there for a few seconds.
> They clearly know each other. This man, this bigger, heavier-set man wearing the short-sleeved black shirt and the lighter-colored pants, the interesting thing about this man is that this is the same man who, four minutes later, picks a fight with Alden Gibbs.

Cox's counsel objected, stating, "[T]here's no evidence of that." The trial court overruled the objection, stating, "This is argument." Later, during her rebuttal closing, the prosecutor argued as follows:

> Defense counsel told you if you had any remaining questions, that's reasonable doubt; that if you think there are things that the police should have done that they did not do, that's reasonable doubt; but that's not what your jury instructions say. They say that in order to convict, the State has to prove, beyond a reasonable doubt, the elements of the crime.

> The standard of proof in this case is "beyond a reasonable doubt," and it is the same standard that is applied in every criminal case across the State of Washington and [ ]juries convict on that standard every day.

Cox's counsel again objected, saying, "I'm going to object to the suggestion that it's okay to convict Mr. Cox because other [ ]juries convict other people. That's

not appropriate argument." The trial court then said to the jury, "The jury has the instructions. You'll decide the case based on the instructions provided."

The jury found Cox guilty of attempted murder in the first degree and guilty of assault in the first degree, in each case while armed with a firearm. The trial court later vacated the assault conviction.

After the verdict was announced, Cox learned that Officer Hunt, who had testified at trial, had been suspended in 2014 for using a racial slur while pursuing an African American suspect in October 2013. Cox moved for a new trial, arguing that the State's failure to disclose Officer Hunt's disciplinary history constituted a reversible Brady[2] violation. Cox also argued that the trial court's exclusion of Cox's statement that someone gave him the gun to hide violated his right to present a defense.

The trial court denied the motion and sentenced Cox to a total of 270 months in confinement. Cox appeals.

ANALYSIS

*Sufficiency of the Evidence*

Cox argues that the evidence presented at trial was insufficient to support a finding that he had premeditated intent to cause Gibbs's death. We disagree.

To satisfy the Fourteenth Amendment's due process guarantee, the State "bears the burden of proving every element of every crime beyond a reasonable doubt." U.S. CONST. amend. XIV; State v. Chacon, 192 Wn.2d 545, 549, 431 P.3d 477 (2018). When a defendant challenges the sufficiency of the evidence

---

[2] Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

presented to meet this burden, "he or she admits the truth of all of the State's evidence." State v. Cardenas-Flores, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). "In such cases, appellate courts view the evidence in the light most favorable to the State, drawing reasonable inferences in the State's favor." Cardenas-Flores, 189 Wn.2d at 265-66. "Evidence is sufficient to support a guilty verdict if any rational trier of fact, viewing the evidence in the light most favorable to the State, could find the elements of the charged crime beyond a reasonable doubt." Cardenas-Flores, 189 Wn.2d at 265.

"A person is guilty of an attempt to commit a crime if, *with intent to commit a specific crime*, he or she does any act which is a substantial step toward the commission of that crime." RCW 9A.28.020(1) (emphasis added). Thus, to convict Cox of attempted first degree murder, the State was required to prove that Cox intended to commit first degree murder. This, in turn, required the jury to find that Cox intended to, "[w]ith a premeditated intent to cause the death of another person[,]" cause the death of another person. RCW 9A.32.030(1)(a).

Premeditation "has been defined as 'the deliberate formation of and reflection upon the intent to take a human life.'" State v. Gentry, 125 Wn.2d 570, 597, 888 P.2d 1105 (1995) (quoting State v. Robtoy, 98 Wn.2d 30, 43, 653 P.2d 284 (1982)). "It has further been held to involve 'the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short.'" Gentry, 125 Wn.2d at 597-98 (quoting State v. Ollens, 107 Wn.2d 848, 850, 733 P.2d 984 (1987)). Nevertheless, premeditation "must involve more than a moment in point of time." RCW 9A.32.020(1).

"Premeditation may be proved by circumstantial evidence where the inferences drawn by the jury are reasonable and the evidence supporting the jury's finding is substantial." Gentry, 125 Wn.2d at 598. "Evidence is substantial if it is sufficient to convince a reasonable person of the truth of the finding." State v. Rankin, 151 Wn.2d 689, 709, 92 P.3d 202 (2004). "[S]ufficient evidence to infer premeditation has been found where (1) multiple wounds were inflicted; (2) a weapon was used; (3) the victim was struck from behind; and (4) there was evidence of a motive." Gentry, 125 Wn.2d at 599.

Here, when the evidence—and particularly the video evidence—is viewed in the light most favorable to the State, there was sufficient evidence to support a finding of premeditation. Specifically, a jury could reasonably have inferred from the IC video that Cox knew the heavier-set man wearing a black short-sleeved shirt and light pants with whom Cox was walking in the parking lot about four minutes before the shooting. A jury could also have inferred that this is the same heavier-set man who, a few minutes later, is seen in the IC video walking across the parking lot toward the alley. As discussed, just after 2:16:29 a.m. on the IC video, that man pauses at the very right-hand edge of the frame, then disappears off screen about 10 seconds later. Accordingly, a jury could reasonably have inferred that this is the same man seen on the left side of the Weyerhaeuser video pausing at about 2:16:30 a.m. before continuing toward the alley about 10 seconds later, that this same man then stopped to talk to Gibbs and Pinder at the southwest corner of the Fuel building, and that he and Gibbs then got into a fight.

Additionally, Cox does not dispute that the man with whom Gibbs was

15

fighting was Big Mike, and the jury could reasonably have inferred that Cox was closer to Big Mike than he initially let on. Indeed, a reasonable inference from Cox's substantially undermined testimony that he had no connection "at all" with Big Mike is that Cox had a reason to lie about the nature of their relationship. Cf. State v. Copeland, 130 Wn.2d 244, 291, 922 P.2d 1304 (1996) (explaining, in the context of closing arguments, that reasonable inferences from the evidence may include those about the defendant's credibility). The jury could also reasonably have inferred that when Cox returned to his Camaro about a minute before the shooting, he retrieved a gun from the trunk.

Finally, a jury could reasonably have inferred that Cox was the man wearing a black jacket with white lettering seen entering the frame of the Weyerhaeuser video from the left just as Gibbs and Big Mike began to fight, that he—like others in the vicinity—was aware of the fight as he walked toward it, and that he shot Gibbs multiple times in the back and continued to shoot after Gibbs fell to the ground. In short, there was evidence that Cox procured a weapon, had a motive, and pulled the trigger multiple times. This evidence, viewed in the light most favorable to the State, was sufficient for a rational trier of fact to find that Cox deliberated, as he walked up to the fight, about taking the life of the person who was fighting with his friend, Big Mike. Thus, the evidence was sufficient to support a finding that Cox acted with premeditated intent to kill Gibbs. Cf. Ollens, 107 Wn.2d at 853 (opportunity to deliberate, combined with infliction of numerous knife wounds, motive, and procurement of weapon, sufficient to submit premeditation to jury).

16

Cox disagrees, relying in large part on State v. Hummel, 196 Wn. App. 329, 383 P.3d 592 (2016). But Hummel is readily distinguishable. There, Alice Hummel (Alice) disappeared on October 18, 1990, shortly after her daughter, S.K., told Alice that Alice's husband, Bruce Hummel, had sexually abused her. Hummel, 196 Wn. App. at 332-33. Hummel later told S.K. and her siblings that Alice had taken a job in California. Hummel, 196 Wn. App. at 333. Still later, he told them that Alice had received a promotion and moved to Texas. Hummel, 196 Wn. App. at 333.

Sometime in 2001, S.K.'s older sister became suspicious and filed a missing person report. Hummel, 196 Wn. App. at 333, 334. Detectives interviewed the siblings and then searched for, but never found, Alice's body. Hummel, 196 Wn. App. at 334-35. In 2004, detectives interviewed Hummel about deposits of disability checks that Alice continued to receive after her disappearance. Hummel, 196 Wn. App. at 335. Hummel admitted that, for a period of time, the retirement system in Alaska, where Alice once worked, continued to deposit disability checks for Alice, and he withdrew money from the account into which they were deposited. Hummel, 196 Wn. App. at 335. Hummel later told detectives that Alice committed suicide on October 18, 1990, and that he disposed of her body and took steps to cover up her suicide, ostensibly for the sake of the children. Hummel, 196 Wn. App. at 341-42.

The State charged Hummel with first degree murder, and a jury convicted him as charged. Hummel, 196 Wn. App. at 352. On appeal, Hummel argued that the evidence was insufficient to support a finding of premeditation. Hummel,

196 Wn. App. at 352. The State disagreed, contending that "the jury could infer that after Alice confronted Hummel [about his abusing S.K.], he formed the intent to kill her." Hummel, 196 Wn. App. at 356. We rejected the State's argument, observing that "there is *no evidence* to show that Hummel knew that in October 1990, S.K. disclosed to Alice that he had been molesting S.K. or that Alice ever confronted Hummel." Hummel, 196 Wn. App. at 356 (emphasis added). Specifically, "*no witness* testified that Alice confronted Hummel about the molestation." Hummel, 196 Wn. App. at 356 (emphasis added). We also observed that even if the evidence supported a reasonable inference of a confrontation, "there is *no evidence* to show deliberation or reflection before Hummel killed Alice." Hummel, 196 Wn. App. at 356 (emphasis added). Specifically, the evidence that Hummel disposed of Alice's body and fraudulently obtained her disability checks after she died was evidence of *guilt*, but not probative of premeditation. Hummel, 196 Wn. App. at 356-57. In short, "the State presented *no evidence* of motive, planning, the circumstances or the method and manner of death, or the deliberate formation of the intent to kill Alice .beforehand." Hummel, 196 Wn. App. at 358 (emphasis added).

Here, by contrast, the State *did* present such evidence. Specifically, and as discussed, there was evidence of motive because a jury could reasonably infer that Gibbs had been fighting with Cox's friend, Big Mike. There also is evidence of the manner and method of the shooting, i.e., that Gibbs was shot from behind, that the shooter continued shooting after Gibbs fell, and that the shooter would have had to pull the trigger multiple times given that the handgun

18

recovered was semi-automatic. Therefore, Cox's reliance on Hummel is misplaced.

Cox next argues that there was insufficient evidence of premeditation because the shooting itself took only three seconds. He notes that in State v. Bingham, 105 Wn.2d 820, 824, 828, 719 P.2d 109 (1986), our Supreme Court held that even if it takes three to five minutes to effect death by manual strangulation, "manual strangulation alone is insufficient evidence to support a finding of premeditation." It follows, Cox argues, that three seconds of shooting is insufficient. But in Bingham, "*no* evidence was presented of deliberation or reflection before or during the strangulation, only the strangulation." 105 Wn.2d at 827. Here, as discussed, there was evidence—apart from the shooting itself— from which the jury could reasonably have inferred deliberation or reflection. Furthermore, manual strangulation involves one continuous act, and "[h]olding a hand over someone's mouth or windpipe does not necessarily reflect a decision to kill the person, but possibly only to quiet her or him." Bingham, 105 Wn.2d at 826. The same cannot be said about shooting at a person multiple times with a semi-automatic pistol. Cox's argument fails.

*Jury Instructions*

Cox argues that reversal is required because the court's to-convict instruction failed to instruct the jury on each element of attempted first degree murder. We disagree.

As an initial matter, the State argues that Cox waived any error because he did not challenge the jury instructions at trial and cannot demonstrate that

they relieved the State of its burden. But under RAP 2.5(a)(3), "[a] defendant may . . . raise an error for the first time on appeal if it is of constitutional magnitude[,]" and "[t]he issue of omission of an element from [the to-convict] instruction is of sufficient constitutional magnitude to warrant review when raised for the first time on appeal." State v. Aumick, 126 Wn.2d 422, 429, 894 P.2d 1325 (1995); State v. Mills, 154 Wn.2d 1, 6, 109 P.3d 415 (2005). Therefore, we address the merits of Cox's claim of instructional error.

"The due process clause of the Fourteenth Amendment to the United States Constitution requires that jury instructions adequately convey to the jury that the State bears the burden of proving 'every element of the crime charged beyond a reasonable doubt.'" State v. Imokawa, No. 96217-1, slip op. at 6 (Wash. Oct. 10, 2019), http://www.courts.wa.gov/opinions/pdf/962171.pdf (quoting State v. Brown, 147 Wn.2d 330, 339, 58 P.3d 889 (2002)). "When a defendant challenges the adequacy of specific jury instructions informing the jury of the State's burden of proof, [this court] review[s] the challenged instructions de novo." Imokawa, slip op. at 6-7.

As a general matter, "'[j]ury instructions are sufficient if they are supported by substantial evidence, allow the parties to argue their theories of the case, and when read as a whole properly inform the jury of the applicable law,' and we review jury instructions 'in the context of the instructions as a whole.'" Mills, 154 Wn.2d at 7 (alteration in original) (quoting State v. Clausing, 147 Wn.2d 620, 626, 56 P.3d 550 (2002); State v. Pirtle, 127 Wn.2d 628, 656, 904 P.2d 245 (1995)). That said, "the reviewing court generally 'may not rely on other

20

instructions to supply [an] element missing from the 'to-convict' instruction.'" Mills, 154 Wn.2d at 7 (quoting State v. DeRyke, 149 Wn.2d 906, 910, 73 P.3d 1000 (2003)).

To that end, RCW 9A.28.020(1) defines the elements of criminal attempt and provides, "A person is guilty of an attempt to commit a crime if, with intent to commit a specific crime, he or she does any act which is a substantial step toward the commission of that crime." In other words, "an attempt crime contains only two elements—[1] intent to commit a specific crime and [2] taking a substantial step toward the commission of that crime." State v. Nelson, 191 Wn.2d 61, 74, 419 P.3d 410 (2018); see also DeRyke, 149 Wn.2d at 910-11.

Here, the court's to-convict instruction, which is consistent with WPIC 100.02,[3] instructed the jury as follows:

> To convict the defendant of the crime of attempted murder in the first degree, as charged in Count I, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about January 16, 2017, the defendant did an act that was a substantial step toward the commission of murder in the first degree;
> (2) That the act was done with the intent to commit murder in the first degree; and
> (3) That the act occurred in the State of Washington.
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty as to Count I.
> On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty as to Count I.[4]

---

[3] 11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 100.02, at 434 (4th ed. 2016) (WPIC).
[4] WPIC 100.02 provides:

The very next instruction, Instruction 4, defined murder in the first degree: "A person commits the crime of murder in the first degree when, with a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person."

The court's instructions were adequate. Specifically, the to-convict instruction set forth both statutory elements of attempt; no elements were missing from the instruction. Additionally, when taken together, the instructions informed the jury of the applicable law, were not misleading, and permitted Cox to argue his theory of the case. Therefore, reversal is not required.

DeRyke is instructive. In that case, our Supreme Court reiterated that the crime of attempt has only two elements. DeRyke, 149 Wn.2d at 910. It also expressly approved of instructing the jury on attempt using WPIC 100.02 and using a *separate* instruction to set forth the elements of the crime allegedly attempted. DeRyke, 149 Wn.2d at 911. Indeed, the Supreme Court itself later

---

To convict the defendant of the crime of attempted (fill in crime), each of the following elements of the crime must be proved beyond a reasonable doubt:
    (1) That on or about (date), the defendant did an act that was a substantial step toward the commission of (fill in crime);
    (2) That the act was done with the intent to commit (fill in crime); and
    (3) That the act occurred in the State of Washington.
If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

characterized <u>DeRyke</u> as "reiterat[ing] . . . that an attempt instruction *does not have to provide the elements of the crime allegedly attempted.*" <u>Nelson</u>, 191 Wn.2d at 74 (emphasis added). Here, by instructing the jury on attempt through WPIC 100.02 and using a separate instruction to set forth the elements of first degree murder, the trial court followed the same approach expressly approved of in <u>DeRyke</u>. This was not error. Indeed, we have relied on <u>DeRyke</u> to reject the argument that Cox makes here. <u>See, e.g.</u>, <u>State v. Jefferson</u>, 199 Wn. App. 772, 809-10, 401 P.3d 805 (2017), <u>rev'd</u> <u>on</u> <u>other</u> <u>grounds</u>, 192 Wn.2d 225, 429 P.3d 467 (2018); <u>State v. Boswell</u>, 185 Wn. App. 321, 336-37, 340 P.3d 971 (2014); <u>cf.</u> <u>State v. Reed</u>, 150 Wn. App. 761, 772, 208 P.3d 1274 (2009) (rejecting the same argument and stating that it "conflates the intent necessary to prove an attempt with that necessary to prove first degree murder").

Cox relies on <u>State v. Vangerpen</u>, 125 Wn.2d 782, 888 P.2d 1177 (1995), for the proposition that premeditation is an essential element of attempted first degree murder that must be included in the to-convict instruction. But his reliance on <u>Vangerpen</u> is misplaced for two reasons.

First, <u>Vangerpen</u> did not hold that premeditation is an essential element of attempted first degree murder. Rather, in <u>Vangerpen</u>, the State conceded that premeditation was an essential element; therefore, that issue simply was not before the court. <u>See</u> <u>Vangerpen</u>, 125 Wn.2d at 785-86; <u>see also</u> <u>Boswell</u>, 185 Wn. App. at 336 ("<u>Vangerpen</u> does not articulate what the essential elements of attempted first degree murder are.").

Second, <u>Vangerpen</u> involved a challenge to a charging document, not a

challenge to a jury instruction. 125 Wn.2d at 787. "The rule that a charging document must include all essential elements of a crime is grounded in the constitutional requirement that defendants be informed of the nature and cause of the accusation against them, in addition to due process concerns regarding notice." State v. Taylor, 140 Wn.2d 229, 236, 996 P.2d 571 (2000). Meanwhile, "'a to convict instruction must contain all of the elements of the crime because it serves as a yardstick by which the jury measures the evidence to determine guilt or innocence.'" DeRyke, 149 Wn.2d at 910 (internal quotation marks omitted) (quoting State v. Smith, 131 Wn.2d 258, 263, 930 P.2d 917 (1997)). In other words, the to-convict instruction ensures "that the jury is not left guessing at the meaning of an element of the crime and that the State is not relieved of its burden of proving each element of the crime." State v. Saunders, 177 Wn. App. 259, 261, 311 P.3d 601 (2013). Therefore, "the fact that a portion of a definition must be included in a[ ] . . . [charging document] does not mean it is essential to a to-convict instruction." Saunders, 177 Wn. App. at 270. Thus, Vangerpen does not control.

Cox next argues that the instructions relieved the State of its burden because "the jury was instructed to find Mr. Cox guilty if he had the intent to accomplish the death of Mr. Gibbs and took a substantial step toward causing his death." Put another way, he contends that the jury was instructed not on attempted first degree murder, but on attempted *second degree* murder. But this is not the case. Specifically, part (2) of the to-convict instruction required the jury to find that "the act was done with the *intent to commit murder in the first degree*."

(Emphasis added.) When this part of the instruction is read in conjunction with the definition of murder in the first degree, the jury was instructed to find that "the act was done with the intent to [*with a premeditated intent to cause the death of another person*, cause the death of such person or of a third person]." In other words, the jury could not have convicted Cox of attempted *first degree murder* without finding that he intended to cause the death of another person *with premeditated intent to cause the death of another person.* Therefore, Cox's argument fails.

Cox next argues that State v. Aumick, 126 Wn.2d 422, is instructive here. But in Aumick, the to-convict instruction failed to instruct the jury that an attempt to commit a crime requires proof of intent. 126 Wn.2d at 429. Instead, it defined attempt solely as "'taking a substantial step in the commission of a crime.'" Aumick, 126 Wn.2d at 429 n.20. Here, by contrast, part (2) of the to-convict instruction instructed the jury to find "[t]hat the act was done *with the intent to commit murder in the first degree."* (Emphasis added.) Therefore, Aumick is distinguishable and does not control.

Cox next argues that the to-convict instruction "was improper because it was nonsensical." Specifically, he contends that it "instructed [the jury] to convict Mr. Cox if he *intended to form premeditated intent to kill Mr. Gibbs,* and took a substantial step toward doing so." (Emphasis added.) This argument is unpersuasive for two reasons.

First, and as discussed, when read together, the to-convict instruction and the definition of first degree murder—which was in the very next instruction—

25

instructed the jury to find that Cox intended to cause the death of another person *with premeditated intent to cause the death of another person.* A reasonable juror would not have interpreted the instruction in the strained way that Cox does. See State v. Miller, 131 Wn.2d 78, 90, 929 P.2d 372 (1997) (jury instructions are interpreted in the way "a reasonable juror could have interpreted the instruction").

Second, Cox's reliance on State v. Smith, 131 Wn.2d 258, to support his argument is misplaced. In Smith, which involved a conspiracy charge, the to-convict instruction should have required the jury to find that the defendant agreed with his alleged co-conspirators *to engage in conduct constituting the crime of first degree murder.* 131 Wn.2d at 262. Instead, the instruction required the jury to find that the defendant agreed with his alleged co-conspirators "'to engage in . . . the performance of conduct constituting the crime of *Conspiracy* to Commit Murder in the First Degree[.]'" Smith, 131 Wn.2d at 262 (alterations in original). Our Supreme Court held that this instruction was "constitutionally defective because it purports to be a complete statement of the law *yet states the wrong crime as the underlying crime which the conspirators agreed to carry out.*" Smith, 131 Wn.2d at 263 (emphasis added).

The to-convict instruction here did not suffer from the same defect. Rather, it stated the correct crime, i.e., first degree murder, as the underlying crime that Cox allegedly attempted to carry out. Moreover, the instruction in Smith was, as a result of the defect, entirely circular: It instructed the jury to find the defendant guilty of conspiracy if he engaged in conduct constituting conspiracy. Thus, as the Smith court explained, the instruction "fails to state the

law completely and correctly." 131 Wn.2d at 263. Here, by contrast, the to-convict instruction completely and correctly stated the law. Specifically, it required the jury to find that Cox "did an act that was a substantial step toward the commission of murder in the first degree" and that "the act was done *with the intent to commit murder in the first degree*." (Emphasis added.) As discussed, when read together with the next instruction defining murder in the first degree, the instruction required the jury to find that Cox intended to cause the death of another person *with premeditated intent to cause the death of another person.* The instruction did not relieve the State of its burden.

## Impeachment Evidence

Cox argues that a new trial is warranted because the State withheld impeachment evidence regarding Officer Hunt, the only witness who testified that she saw the shooting and that she did not lose sight of the shooter from the time of the shooting until the time that Officer Barker arrested him. Cox, who is African American, did not learn until after the verdict that Officer Hunt had been disciplined for using a racial slur while pursuing an African American suspect and then attempting to justify it. We conclude that a new trial is not warranted because this evidence was not material when viewed in the context of the entire record.

Under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), "the prosecution has a duty to seek out exculpatory and impeaching evidence held by other government actors. State v. Davila, 184 Wn.2d 55, 71, 357 P.3d 636 (2015). To establish a Brady violation, a defendant must establish

27

three necessary elements: "(1) '[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching,' (2) 'th[e] evidence must have been suppressed by the State, either willfully or inadvertently,' and (3) the evidence must be material." Davila, 184 Wn.2d at 69 (alterations in original) (quoting Strickler v. Greene, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999)).

Here, the State concedes "that it did not fulfill its duty to proactively discover and disclose favorable evidence 'known to the others acting on the government's behalf in the case, including the police.'" Therefore, the only question before this court is whether the evidence regarding Officer Hunt is material. "Brady materiality is a legal question that is reviewed de novo." Davila, 184 Wn.2d at 74.

"Evidence is material under Brady 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Davila, 184 Wn.2d at 73 (internal quotation marks omitted) (quoting Kyles v. Whitley, 514 U.S. 419, 433-34, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)). "To satisfy this standard, a defendant need not demonstrate by a preponderance that he would have been acquitted had the suppressed evidence been disclosed." Davila, 184 Wn.2d at 73. "Instead, he or she must show only that 'the government's evidentiary suppression undermines confidence in the outcome of the trial.'" Davila, 184 Wn.2d at 73 (internal quotation marks omitted) (quoting Kyles, 514 U.S. at 434).

Here, the State contends that Officer Hunt's disciplinary record is not

28

material because "the jury would have convicted Cox even if it rejected Officer Hunt's testimony entirely." In other words, the State suggests that impeachment evidence is not material if the result of the trial would have been the same even if the would-be impeached witness had never testified.

But this is an inaccurate interpretation of the test for Brady materiality, and we reject the State's suggestion that we can determine materiality simply by pretending that Officer Hunt had never testified. Rather, we imagine a trial in which Officer Hunt's past behavior had been used to impeach her and ask whether there is a reasonable probability that the result of the proceeding would have been different. We conclude that there is not.

In reaching our conclusion, we underscore that this court takes issues of racial bias seriously, and we are deeply troubled by Officer Hunt's past behavior and by the State's failure to disclose it before trial. We also note that it is not difficult to imagine a case where evidence of Officer Hunt's racial bias and her attempts to justify her use of a racial slur would have called other aspects of the State's case, such as the police investigation, into serious doubt. But this is not such a case. Here, the videos—which show Cox walking toward the alley and off the right side of the IC video just as the apparent shooter emerges onto the left side of the Weyerhaeuser video—constitute independent and overwhelming evidence that Cox was the shooter. So does the testimony of Officer Barker, who independently pursued Cox after he saw him walking, then running, away from the scene. Indeed, Cox's own testimony, which confirmed that he discarded the murder weapon after the shooting, was also strong, independent evidence of

his guilt. In short, because of the overwhelming, *independent* evidence of Cox's guilt, there is not a reasonable probability that the result of the trial would have been different had evidence of Officer Hunt's disciplinary record been disclosed. Therefore, that evidence was not material.

Cox disagrees. He contends that the evidence was material because "[t]he [Weyerhaeuser] video showed only that the perpetrator was wearing a black jacket with white writing" and "*everyone* was wearing black" that night. He also points out that he testified that he merely picked up the gun after it was discarded by the shooter and that he had no reason to shoot Gibbs given that Gibbs was fighting with "a *different* person unrelated to" Cox. Finally, he characterizes Officer Hunt as the State's "star witness," observing that she was the only witness who claims to have seen Cox shoot Gibbs and that she bolstered her credibility by touting her promotion to sergeant.

But Cox's argument ignores that when assessing Brady materiality, the omitted evidence is evaluated in the context of the entire record. Davila, 184 Wn.2d at 78. To that end, the videos do not show merely that the perpetrator was wearing a black jacket with white writing; rather, they show Cox walking in the direction of the alley about 20 seconds before the shooting wearing a very similar-looking jacket and disappearing from the IC video's frame just as the apparent shooter appears on the frame of the Weyerhaeuser video. Also as discussed, there is evidence that Cox *did* have a reason to shoot Gibbs because Gibbs was fighting with Cox's friend. Finally, and although Officer Hunt claimed that she did not lose sight of the shooter until the time of the shooting until he,

i.e., Cox, was arrested, Officer Hunt was not the State's "star"—rather, the videos were. Cox's arguments are not persuasive.

Cox next relies on United States v. Price, 566 F.3d 900 (9th Cir. 2009), to contend that the evidence was material. But Price is readily distinguishable on its facts. There, Delray Price was convicted of being a felon in possession of a firearm after officers found a gun hidden beneath the driver's seat of a car in which Price was riding in the rear. Price, 566 F.3d at 902. The evidence that "sealed [Price's] fate" was testimony from Antoinette Phillips, who testified that about 15 minutes before Price was pulled over, she saw a gun tucked into the waistband of Price's pants. Price, 566 F.3d at 902. What neither Price nor his counsel knew was that Phillips "ha[d] a lengthy history of run-ins with the . . . police that suggests that she has little regard for truth and honesty." Price, 566 F.3d at 903.

In concluding that this undisclosed history was material under Brady, the Ninth Circuit observed that Phillips's testimony was one of only three items of evidence introduced by the prosecution, the other two of which were "significantly undermined" by Price's counsel's questioning at trial. Price, 566 F.3d at 913. Thus, Phillips was "indisputably 'the prosecution's star witness[,]'" and the court characterized her testimony as critical to the prosecution's case. Price, 566 F.3d at 914 (quoting Carriger v. Stewart, 132 F.3d 463, 480 (9th Cir. 1997)).

Here, and as discussed, Officer Hunt's testimony was not similarly critical given the strong independent evidence presented by the videos and other testimony. Furthermore, unlike in Price, the other evidence was not "significantly

31

undermined." 566 F.3d at 913. Therefore, Cox's reliance on Price is misplaced.

*Exclusion of Cox's Exculpatory Statement*

Cox argues that reversal is required because the trial court erred by excluding, as hearsay, his statement to Officer Barker that someone gave him the gun to hide. Because the exclusion of Cox's statement was harmless, we disagree.

"The erroneous exclusion of evidence is harmless if, within reasonable probabilities, the error did not affect the result of the trial." City of Seattle v. Personeus, 63 Wn. App. 461, 465, 819 P.2d 821 (1991). Here, the trial court excluded Cox's statement because it determined that it "has [no] relevance for a non-hearsay purpose." In other words, the trial court excluded Cox's statement either (1) because it was hearsay or (2) because it was not relevant. We do not decide whether exclusion of Cox's statement was error because even if it was, that error was harmless.

Specifically, there was overwhelming evidence that Cox was the shooter. As discussed, the IC video shows Cox walking toward the alley wearing a black jacket with white lettering on the back and disappearing from the right side of the IC video's frame. Just a moment later, the apparent shooter emerges onto the left side of the Weyerhaeuser video, walking toward the alley. Given this convincing evidence that Cox was the shooter, the exclusion of his statement did not, within reasonable probabilities, affect the result of the trial. Therefore, reversal is not required.

Cox disagrees. He contends that the exclusion of his statement deprived

him of his right to present a defense and, therefore, this court must apply a constitutional harmless error analysis to determine if reversal is required. He relies on State v. Jones, 168 Wn.2d 713, 230 P.3d 576 (2010), and State v. Duarte Vela, 200 Wn. App. 306, 402 P.3d 281 (2017), to support his argument, but his reliance on these cases is misplaced.

In both Jones and Duarte Vela, the evidence excluded by the trial court was highly relevant to the defendant's defense. In Jones, a rape case, the trial court barred the defendant from testifying that the sexual contact was consensual and took place at an all-night sex party. 168 Wn.2d at 717. And in Duarte Vela, a murder case, the trial court excluded evidence that the defendant acted in self-defense. 200 Wn. App. at 320. In each case, the trial court's ruling was later determined to have deprived the defendant of his right to present a defense. Jones, 168 Wn.2d at 717; Duarte Vela, 200 Wn. App. at 320. And in each case, the appellate court explained that this was so because the evidence had high probative value. Jones, 168 Wn.2d at 724; Duarte Vela, 200 Wn. App. at 326. Indeed, in Jones, the evidence constituted the defendant's "entire defense." 168 Wn.2d at 721. And in Duarte Vela, the evidence "was central to [the defendant]'s ability to explain the reasonableness of his fear." 200 Wn. App. at 320.

Here, Cox's defense theory was that the "police simply chose the wrong person to arrest" and that "because they thought they had found what they were looking for, they just quit looking." But Cox's statement that someone gave him the gun to hide is, at best, only minimally—not highly—probative of whether officers should have conducted further investigation. It also was not central to his

defense because its exclusion did not prevent him from telling his side of the story or from presenting any evidence that he was not, in fact, the shooter. Moreover, Cox's counsel effectively elicited testimony from several State witnesses about additional investigation or evidence gathering that could have occurred and additional forensic testing that could have been done. Cox's counsel then emphasized these alleged inadequacies in his closing argument, summing them up with, "The police did their job badly, horribly, hopelessly inadequately; and now they have left this with you, and now it is your job to figure out what happened." The exclusion of Cox's minimally probative statement did not prevent him from executing his defense strategy. Therefore, Jones and Duarte Vela are not persuasive here. See State v. Arndt, No. 95396-1, slip op. at 31-32 (Wash. Dec. 5, 2019), http://www.courts.wa.gov/opinions/pdf/953961.pdf (distinguishing Jones on the basis that it involved highly probative evidence constituting the defendant's entire defense and holding that trial court's exclusion of certain testimony did not violate defendant's right to present a defense where defendant was "able to present relevant evidence supporting her central defense theory").

*Prosecutorial Misconduct*

Cox argues that a new trial is warranted because the prosecutor committed misconduct during closing by (1) arguing facts not in evidence and (2) trivializing the burden of proof. We disagree.

"'In closing argument, a prosecutor is afforded wide latitude to draw and express reasonable inferences from the evidence.'" State v. Robinson, 189 Wn.

App. 877, 893, 359 P.3d 874 (2015) (quoting State v. Reed, 168 Wn. App. 553, 577, 278 P.3d 203 (2012)). Nevertheless, a prosecutor commits misconduct by arguing facts not in evidence. In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 705, 286 P.3d 673 (2012). A prosecutor also commits misconduct by trivializing the State's burden of proof, including by "'compar[ing] the reasonable doubt standard to everyday decision making.'" State v. Lindsay, 180 Wn.2d 423, 436, 326 P.3d 125 (2014) (quoting State v. Lindsay, 171 Wn. App. 808, 828, 288 P.3d 641 (2012)).

"This court reviews a trial court's decision on alleged prosecutorial misconduct for abuse of discretion." Robinson, 189 Wn. App. at 893. "To prevail on a claim of prosecutorial misconduct, the defendant must establish 'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.'" State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011) (internal quotation marks omitted) (quoting State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008)). "[This court] review[s] the prosecutor's conduct and whether prejudice resulted therefrom 'by examining that conduct in the full trial context, including the evidence presented, the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.'" State v. Pinson, 183 Wn. App. 411, 416, 333 P.3d 528 (2014) (internal quotation marks omitted) (quoting State v. Monday, 171 Wn.2d 667, 675, 257 P.3d 551 (2011)).

Here, the prosecutor should not have been as conclusory as she initially was in asserting that the "bigger, heavier-set man wearing the short-sleeved

black shirt and the lighter-colored pants" in the IC video was "the same man who, four minutes later, picks a fight with Alden Gibbs." The prosecutor also should not have suggested that juries "convict on [the reasonable doubt] standard every day."

Nevertheless, the prosecutor's statements were not prejudicial in the context of the entire record. Specifically, after defense counsel objected, the prosecutor explained in further detail why her assertion about the IC video was a reasonable inference from the evidence. And as already discussed, her assertion was, indeed, a reasonable inference. And the prosecutor's comment regarding the reasonable doubt standard was made in the context of trying to rebut defense counsel's argument that "[t]he police did their job badly, horribly, hopelessly inadequately," suggesting that the jury should acquit if it believed there was additional investigation the police could have done. Furthermore, upon defense counsel's objection, the trial court immediately instructed the jury to decide the case based on the instructions provided, and there is no evidence suggesting that the jury did not do so. Cf. State v. Brown, 132 Wn.2d 529, 618, 940 P.2d 546 (1997) ("A jury is presumed to follow instructions given."). Therefore, the prosecutor's statements, though overreaching, do not require reversal.

*Cumulative Error*

Cox argues that he is entitled to a new trial under the cumulative error doctrine. We disagree.

"Under the cumulative error doctrine, a defendant may be entitled to a new

trial when cumulative errors produce a trial that is fundamentally unfair." State v. Emery, 174 Wn.2d 741, 766, 278 P.3d 653 (2012). "The application of [the] doctrine is limited to instances when there have been several trial errors that standing alone may not be sufficient to justify reversal but when combined may deny a defendant a fair trial." State v. Greiff, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). Thus, "[t]he doctrine does not apply where the errors are few and have little or no effect on the trial's outcome." State v. Venegas, 155 Wn. App. 507, 520, 228 P.3d 813 (2010).

Cox chiefly relies on Venegas to urge this court to apply the cumulative error doctrine here. But his reliance is misplaced. In Venegas, Loni Venegas was convicted of three counts of assault of a child for assaulting her step-grandson, JV. 155 Wn. App. at 510. On appeal, Division Two determined that several errors had occurred at trial:

> Rather than trusting the jury to reach a proper conclusion after listening to dozens of witnesses over the course of a six-week trial, the State twice made arguments that impinged on Venegas's presumption of innocence. Additionally, the trial court levied an excessive CrR 4.7(h)(7) discovery sanction that prevented the defense from potentially presenting expert testimony that JV's chin injury—the basis of count II—could not have occurred as JV described it. . . . Finally, the trial court failed to balance the prejudicial effect of "other acts" evidence against its probative value.

Venegas, 155 Wn. App. at 526-27 (footnote omitted). In concluding that these errors cumulatively warranted reversal, the court observed that the case "turned largely on witness credibility," that JV's testimony was the only evidence the State presented with regard to one of the counts, and that "had the jury heard expert testimony that undermined JV's version of events on one count, the jury

37

might have viewed JV's testimony with respect to the other counts in a different light." Venegas, 155 Wn. App. at 526-27.

Here, by contrast, the errors were few and had little or no effect on the trial's outcome. Specifically, even assuming that the trial court erred by excluding Cox's statement that someone gave him the gun to hide, that statement was, as discussed, only minimally probative. And the only other error in this case consisted of the prosecutor's overreaching but non-prejudicial comments in closing. Finally, although witness credibility is relevant in any case, this was not a case that turned largely on witness credibility as was the case in Venegas. For these reasons, Venegas is not persuasive.

We affirm.

WE CONCUR:

38